**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 2 2004**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

# UNITED STATES COURT OF APPEALS
## TENTH CIRCUIT

---

ESTATE OF H. A. TRUE, JR.,
Deceased, H. A. True III Personal
Representative; JEAN D. TRUE,

Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL
REVENUE,

Respondent-Appellee.

Nos. 02-9010, 02-9011, 02-9012

---

**Appeal from the United States Tax Court**
**(T.C. Nos. 10940-97, 3408-98, 3409-98)**

---

Buford P. Berry (Mary A. McNulty and Katherine Quigley, Thompson & Knight
L.L.P., and Ronald M. Morris, Casper, Wyoming, with him on the briefs),
Thompson & Knight L.L.P., Dallas, Texas, for Petitioners-Appellants.

Joan I. Oppenheimer, Attorney, Tax Division, Department of Justice (Eileen J.
O'Connor, Assistant Attorney General, and Jonathan S. Cohen, Attorney, Tax
Division, Department of Justice, with her on the briefs), Washington, D.C., for
Respondent-Appellee.

---

Before **SEYMOUR**, Circuit Judge, **PORFILIO,** Senior Circuit Judge, and
**MURPHY**, Circuit Judge.

---

**SEYMOUR**, Circuit Judge.

This appeal arises out of the consolidation of three separate tax deficiency notices issued by the Commissioner of Internal Revenue (I.R.S.) against the estate of H. A. True, Jr., deceased, H. A. True III, personal representative, and Jean D. True (collectively, taxpayers), regarding the transfer of interests in six different family businesses subject to longstanding buy-sell agreements. Taxpayers filed timely petitions in tax court challenging the I.R.S.'s estate and gift tax deficiency determinations. After a week-long trial, the tax court issued an extensive 336 page Memorandum Findings of Fact and Opinion, *see Estate of True v. C.I.R.*, 82 T.C.M. (CCH) 27 (2001), in which it rejected taxpayers' contention that the formula price and other restrictive terms in the buy-sell agreements controlled the value of the transferred business interests for estate and gift tax purposes. The court also imposed penalties against taxpayers for undervaluing the interests on their tax returns. Taxpayers appeal, and we affirm.

# I

H. A. True, Jr. (Dave True or Dave), was born on June 12, 1915, and married Jean Durland (Jean True or Jean) in 1938. They remained married until Dave's death on June 4, 1994. During their marriage they had four children: Tamma True Hatten (Tamma), H. A. True III (Hank), Diemer D. True (Diemer), and David L. True (David).

Dave was a successful entrepreneur and established a number of companies involved in oil and gas exploration, marketing, and transportation. The companies relevant to this appeal include True Oil Company, Belle Fourche Pipeline Company, Eighty-Eight Oil Company, and Black Hills Trucking Company. These companies often worked in concert, providing services to one another and assisting in one another's efforts. Companies which generated a substantial amount of revenue often provided the funds to support companies which were not as profitable. Dave also established ranching operations. These included the True Ranches, Inc., "a vertically integrated cattle operation, running herds of cows and their offspring from conception through finishing ready for slaughter," *Estate of True*, 82 T.C.M. (CCH) at 36, and White Stallion Ranch, Inc., which operated as a guest ranch.[1]

Due to an unsatisfactory work experience early in his career, Dave developed a business philosophy which was guided by four basic principles. He did not want to own a business with anyone but his own family members, every business owner or partner should be actively engaged in the business, buy-sell agreements were necessary to avoid conflicts among owners and to establish clear

---

[1]Of these business entities, True Oil, Eighty-Eight Oil, and the True Ranches were structured as partnerships under Wyoming law. Belle Fourche Pipeline, Black Hills Trucking, and White Stallion Ranch were structured as Subchapter S corporations.

exit strategies, and outside debt would be incurred only as a last resort. Each True company was governed by buy-sell agreements which embodied these business principles. The agreements dictated that an owner or partner could not transfer or encumber his or her interests in the business, and each owner or his or her spouse had to work in the business. Failure to work in the business, any attempt to transfer an interest in the business, death, and disability were each treated as if the holder of the interest had notified the other owners of his or her intent to withdraw from ownership. Upon the occurrence of such an event, the other owners were required to purchase the departing owner's interests at a formula price listed in the buy-sell agreement.

The formula prices in the buy-sell agreements were derived from a calculation of the tax book value for the various True companies. The companies characteristically kept their business records according to tax book values rather than following generally accepted accounting principles (GAAP). The companies used the tax book accounting method for a variety of reasons. Under this method, the companies could take greater advantage of certain tax deductions and accelerated rates of depreciation granted to the oil and ranching industries. Likewise, because the Trues intended to keep their businesses strictly within the family, they determined there was no need to have their financial records exhibit the value of their companies as if placed on the public market. By using a tax

-4-

value accounting method, however, the book values for the True companies tended to be much lower than what would be calculated under GAAP and did not always represent the fair market value of the businesses had they been liquidated. Because of the varying tax incentives granted to the oil, gas, and ranching industries, which allow for increased rates of depreciation and deductions, the tax value accounting method occasionally even resulted in a negative book value figure for some of the True companies.

As Dave and Jean True established new businesses or gained full control over businesses in which they formerly shared interests with non-family members, they entered into buy-sell agreements with one another. Characteristically, Dave possessed a larger percentage of shares or interest in the businesses than did Jean. Dave and Jean also took steps to ensure their children's involvement in the family businesses. As high school students, the True children participated in the businesses by attending the True companies' annual supervisor meetings and semiannual family business meetings. Likewise, throughout junior high school, high school, and college, the True sons had jobs on the family's ranches and in the oil businesses.

In 1971, each child acquired a one percent interest in Belle Fourche Pipeline, which they purchased from the corporation at tax book value. At this time, the children were between twenty-one and thirty-one years of age. Dave

and Jean did not report the transfers on a gift tax return because the children's acquisition of the Belle Fourche Pipeline stock had been structured as a sale rather than a gift. In 1973, Dave and Jean also gave each child an eight percent interest in True Oil and True Drilling.[2] Dave and Jean both reported the 1973 gifts to their children on their gift tax returns for that year, valuing the gifts in terms of their tax book values.[3]

The I.R.S. determined gift tax deficiencies against Dave and Jean for both the 1971 and 1973 transfers, asserting that the transfers involved "unreported gifts equal to the difference between the fair market value of the transferred interests and the amount paid for the interests or the amount reported as gifts." Aplt. br. at 9. The Trues paid the deficiencies and brought two refund suits in federal district court. *See True v. United States*, 547 F. Supp. 201 (D. Wyo. 1982) (1973 gift tax case); *True v. United States*, No. C79-131K (D. Wyo. Oct. 1, 1980) (1971 gift tax case). In both cases, the district court sustained the Trues' argument that the fair market value of the transferred interests was the reported tax book value.[4]

---

[2]The value of transferred interests in True Drilling are not at issue in this case. We therefore limit our subsequent discussions regarding the 1973 transfers to that of True Oil.

[3]Jean True agreed to treat the gifts as being made one-half by each spouse.

[4]The district court reached its conclusions, in large measure, by relying on
(continued...)

-6-

Dave and Jean also consistently made annual gifts to their children and their spouses. These gifts tended to consist of "cash or ownership interests in various True companies valued at the maximum allowable amount that would not trigger gift tax." *Estate of True*, 82 T.C.M. (CCH) at 37. However, the gifts were never received as cash in hand. Rather, cash gifts were deposited into business bank accounts assigned to each recipient. The funds were then "invested in the True companies, either by purchasing ownership interests or by making interest-bearing loans, or both." *Id.*

Over the years, the children acquired interests in other True companies,

---

[4](...continued)
valuation reports written by Standard Research Consultants (SRC) on behalf of the Trues for the purpose of litigating the gift tax cases. In valuing the two companies, SRC first determined what it considered to be the freely traded values for Belle Fourche Pipeline and True Oil. Rec., ex. 235-P at 55-57; *id.*, ex. 236-P at 68-70. SRC then engaged in a marketability discount analysis for each company. *Id.*, ex. 235-P at 58-59; *id.*, ex. 236-P at 70-72. However, the SRC reports rejected their own marketability discount findings, concluding that the parties to the agreements could never look forward to a public market and would always be limited to the price terms set out in the agreement because of the restrictions in the buy-sell agreements. *Id.*, ex. 235-P at 58-60; *id.*, ex. 236-P at 72. Hence, the SRC reports essentially accepted the price terms in the Belle Fourche Pipeline and True Oil agreements as the equivalent of the fair market value for the transferred interests. In relying on the SRC reports, the district court spoke more directly about applying marketability and minority discounts to the transferred interests, but accepted the SRC valuations as representing appropriately discounted values for Belle Fourche Pipeline and True Oil. *See True v. United States*, 547 F. Supp. 201, 203 (D. Wyo. 1982) (1973 gift tax case); *True v. United States*, No. C79-131K, 3, 5, 6-7 (D. Wyo. Oct. 1, 1980) (1971 gift tax case).

including Eighty-Eight Oil, Black Hills Trucking, True Ranches, and White Stallion Ranch. In obtaining these interests, the children became partners or shareholders in the companies, entered into buy-sell agreements for each, and fulfilled the terms of the agreements by active participation in the businesses. The True children, or their spouses, owned equal percentages of interest in the companies, regardless of the extent of their individual involvement in each. Hank eventually became responsible for managing Belle Fourche Pipeline, Eighty-Eight Oil, and the True family environmental cleanup company. Diemer managed Black Hills Trucking, as well as another True business. David became manager of True Ranches and True Drilling. Tamma briefly worked for the family businesses as a personnel coordinator, and her husband, Donald Hatten, also worked for the True businesses for about ten years.

In 1984, Tamma and her husband withdrew from the True companies to open a ranch operation wholly independent from the True businesses. In accordance with the buy-sell agreements, Tamma's parents and brothers bought out her interests in the companies at tax book value. The combined purchase price Tamma accrued for these interests equaled over $8.5 million. This amount was offset, however, by two of the True companies' negative book values amounting to nearly $1.7 million at the time of the sale. After the sale, the rest of the family amended their various buy-sell agreements to reflect that Tamma and

her husband were no longer owners or participants in the family businesses. Likewise, Dave and Jean ceased making annual gifts to Tamma and amended both of their wills and other estate planning documents to delete any specific provisions for Tamma and her family.[5] They did so out of the belief that Tamma was financially secure as a result of the sale, and because Dave and Jean True wanted their estate to go to their sons so that family funds would be reinvested in the companies and the businesses would stay together. Rec., vol. II at 123; *id.*, vol. III at 397. In one of his testamentary documents, Dave also stated that Tamma was not to receive any assets from his estate. He noted that she had "severed her financial ties with the True companies, and thus her potential inheritance" had been fully satisfied during his lifetime as a result of the sale of her interests. Rec., ex. 13-J at 4; *Estate of True*, 82 T.C.M. (CCH) at 42.

During the 1980s, the True family (except Tamma) purchased several pieces of property to add to the operations of the True Ranches. As discussed in detail in *True v. United States*, 190 F.3d 1165 (10th Cir. 1999), our decision concerning these purchases, the properties were not directly purchased by the True Ranches, but by another one of the True companies. *Id.* at 1168-69. Through a variety of step-transactions–subsequent acquisitions, transfers, and

---

[5]Tamma's descendants nonetheless remain beneficiaries of the True Family Education Trust. *See Estate of True v. C.I.R.*, 82 T.C.M. (CCH) 27, 42 (2001); rec., vol. III at 398.

exchanges among the various True companies–the new ranch land finally became the property of the True Ranches. In the course of this process, the Trues were able to reduce the tax value of the acquired property to zero. The I.R.S. challenged the validity of these transactions and issued tax deficiencies against taxpayers, which they in turn challenged in district court. On appeal, we agreed with the I.R.S. that taxpayers could not reduce the tax value of the ranch lands by taking advantage of various tax depreciations which would normally accompany the series of transactions by which the True Ranches acquired the property. *Id.* at 1179. We held that the varying transactions were "nothing but the Trues' prearranged, integrated plan to accomplish indirectly tax advantages they could not accomplish directly." *Id.* Therefore, we treated the ranch land acquisitions as if they had been directly acquired by the True Ranches, and precluded the Trues from claiming a zero tax value for the new land. *Id.*

In January 1993 and in response to changes in the tax laws, Dave sold to his wife and sons, in accordance with the buy-sell agreements, a portion of his partnership interests in several True companies. Prior to the 1993 sales, Dave held a majority interest in a number of the True partnerships. Under the new tax laws, the transfer of his interests in the partnerships to his wife and sons upon his death in accordance with the buy-sell agreements would have resulted in a termination of the partnerships as well as possible termination of the buy-sell

agreements. *See* I.R.C. § 2701. In order to avoid this result, Dave transferred some of his interests in each partnership to Jean and his sons at tax book value to reduce his overall holdings. Dave and Jean disclosed the transfers on their 1993 gift tax returns but treated them as sales, thereby not reporting any taxable gifts resulting from the transfers. In March 1997, the I.R.S. issued notices of deficiency for the 1993 transfers, contending the values of the transferred interests were higher than the tax book values reported on the tax returns.

On June 4, 1994, Dave died unexpectedly. In accordance with the buy-sell agreements, Dave's remaining interests in the True family companies were transferred to his wife and sons at tax book value. The estate subsequently filed an estate tax return reporting the date-of-death value of Dave's interest in the True family companies as equal to the proceeds the estate received under the buy-sell agreements. In January 1998, the I.R.S. issued a notice of deficiency against the estate, asserting that the values of the True companies listed in the return were higher than the tax book values at which they were sold.

After Dave died, Jean decided she wanted to retire from active participation in the True companies. In compliance with the buy-sell agreements, she sold most of her interests in the companies to her sons at tax book value in June and July 1994. She filed a timely gift tax return for 1994, disclosing the transactions but treating them as sales and reporting she owed no taxes. As with the two

previous transactions, the I.R.S. issued a notice of deficiency, claiming that the values of the interests Jean sold were higher than their reported value.

According to the I.R.S., and as set out here in tabular form, the deficiencies for each of the transactions were as follows:

| | |
|---|---|
| 1993 gift transfer | $15,201,984 |
| 1994 estate value | $43,639,111 |
| 1994 gift transfer | $17,094,788. |

The I.R.S. also determined that taxpayers should be subject to a penalty for substantial underpayment on the estate and gift tax returns. *See* I.R.C. § 6662(a), (b)(5). These penalties were calculated as follows:

| | |
|---|---|
| 1993 gift transfer | $6,080,794 |
| 1994 estate value | $17,455,644 |
| 1994 gift transfer | $6,791,715. |

In total, the I.R.S. calculated the tax deficiencies at over $75 million and the penalties at over $30 million.

Taxpayers filed timely petitions with the tax court contesting the I.R.S.'s rulings. During the one week trial, taxpayers' core argument was that the tax book value and other restrictive terms detailed in the buy-sell agreements established the value of the transferred interests for estate and gift tax purposes. The tax court rejected this argument and instead determined the value of the

transferred interests based on evidence presented at trial, including appraisals presented by experts for taxpayers and evidence from an expert rebuttal witness presented by the I.R.S. Based on its own valuation of the interests at issue, the court concluded their values substantially exceeded the amounts asserted by taxpayers, resulting in tax deficiencies and associated penalties under I.R.C. § 6662(a), (b)(5).

The tax court determined the tax deficiencies as follows:

| | |
|---|---|
| 1993 gift transfer | $2,660,800 |
| 1994 estate value | $11,162,543 |
| 1994 gift transfer | $4,446,600. |

In affirming the I.R.S.'s application of penalties, the tax court rejected taxpayers' argument that they showed reasonable cause and good faith in their understatement of tax values and were therefore not subject to penalties. *See* I.R.C. § 6664(c). The tax court calculated the penalties as follows:

| | |
|---|---|
| 1993 gift transfer | $317,352 |
| 1994 estate value | $1,888,032 |
| 1994 gift transfer | $909,590. |

In total, the court's calculation amounted to approximately $18.2 million for tax

deficiencies and $3.1 million for penalties.[6]

In appealing the tax court's decision, taxpayers assert the court erred in concluding the formula prices in the buy-sell agreements did not establish the value of the interests for estate and gift tax purposes. They also argue that even if the formula prices should be disregarded, the tax court erred in not considering the other restrictive terms in the buy-sell agreements when it determined the fair market value of the interests. Finally, taxpayers challenge the tax court's conclusion that the imposition of penalties was appropriate.

**II**

We exercise jurisdiction over this case pursuant to I.R.C. § 7482(a)(1) and review the tax court's decision "in the same manner and to the same extent as decisions of the district courts . . . tried without a jury." *Id.* Therefore, we review legal questions *de novo* and factual questions for clear error. *IHC Health Plans, Inc. v. C.I.R.*, 325 F.3d 1188, 1193 (10th Cir. 2003); *Kurzet v. C.I.R.*, 222 F.3d 830, 833 (10th Cir. 2000). The primary issue we address is whether the price terms in the buy-sell agreements controlled for the purpose of valuing the

---

[6]We note that while the tax court assessed tax deficiencies and penalties against taxpayers, the court's calculations were substantially lower than that calculated by the I.R.S. To taxpayers' benefit, the I.R.S. does not challenge the tax court's lower calculations.

interests in Dave True's estate.

The estate of every decedent who is a United States citizen or resident is subject to tax. *See* I.R.C. § 2001(a). The value of a decedent's gross estate is "determined by including . . . the value at the time of his death all property, real or personal, tangible or intangible, wherever situated." I.R.C. § 2031(a). The value of such property is generally measured in terms of its fair market value, which is the price at which a willing buyer and willing seller with knowledge of all the relevant facts would agree to exchange the property or interest at issue. *See United States v. Cartwright*, 411 U.S. 546, 550-51 (1973); *Heyen v. United States*, 945 F.2d 359, 364 (10th Cir. 1991); Treas. Reg. § 20.2031-1(b). In determining the fair market value of partnership interests or stock in a closely held corporation where no public market exists, courts have looked at a variety of factors to calculate the worth of an interest included in an estate. *See* I.R.C. § 2031(b) (valuation of unlisted stock and securities). To determine the value of closely held stock, it is appropriate to consider

> [t]he good will of the business; the economic outlook of the particular industry; the company's position in the industry and its management; the degree of control of the business represented by the block of stock to be valued; and the values of securities of corporations engaged in the same or similar lines of businesses which are listed on a stock exchange.

Treas. Reg. § 20.2031-2(f). Partnership interests can be valued by "[a] fair appraisal as of the applicable valuation date of all the assets of the business,

-15-

tangible and intangible, including good will; [t]he demonstrated earning capacity of the business;" and other factors relating to the valuation of corporate stock. Treas. Reg. § 20.2031-3. Finally, and particularly relevant here, the price terms in buy-sell agreements can sometimes control the value of assets for estate tax purposes.

As developed in case law, and embodied in Treasury Regulation § 20.2031-2(h),[7] the stated price in a buy-sell agreement will control for estate tax purposes where (1) the price is determinable from the agreement, (2) the terms of the agreement are binding throughout life and death, (3) the agreement is legally binding and enforceable, and (4) the agreement was entered into for bona fide

---

[7]The relevant portion of the regulation reads:

> The effect, if any, that is given to the option or contract price in determining the value of the securities for estate tax purposes depends upon the circumstances of the particular case. Little weight will be accorded a price contained in an option or contract under which the decedent is free to dispose of the underlying securities at any price he chooses during his lifetime. . . . Even if the decedent is not free to dispose of the underlying securities at other than the option or contract price, such price will be disregarded in determining the value of the securities unless it is determined under the circumstances of the particular case that the agreement represents a bona fide business arrangement and not a device to pass the decedent's shares to the natural objects of his bounty for less than an adequate and full consideration in money or money's worth.

Treas. Reg. § 20.2031-2(h).

business reasons and is not a testamentary substitute intended to pass on the decedent's interests for less than full and adequate consideration. *See, e.g., Estate of Gloeckner v. C.I.R.*, 152 F.3d 208, 212-14 (2d Cir. 1998); *St. Louis County Bank v. United States*, 674 F.2d 1207, 1210 (8th Cir. 1982); *Estate of Godley v. C.I.R.*, 80 T.C.M. (CCH) 158, 164 (2000); *Estate of Lauder v. C.I.R.*, T.C.M. (RIA) 92736, 3716, 3729-30 (1992) (*Lauder II*); Treas. Reg. § 20.2031-2(h); Rev. Rule 59-60, 1959-1 C.B. 237, § 8 (1959). For ease of reference, we will refer to this test as the "price term control test."

The tax court found, and the parties generally agree, that the first three prongs of the test are not at issue.[8] We therefore limit our determination to whether the tax court correctly concluded that the price terms in the True company buy-sell agreements do not control for estate tax valuation purposes because the agreements failed to satisfy the fourth prong of the test. We review this question of fact for clear error. *See Estate of Gloeckner*, 152 F.3d at 212,

---

[8]The buy-sell agreement for White Stallion Ranch is an exception. The tax court found that the White Stallion Ranch buy-sell agreement was structured so that it was not equally binding upon transfers during life and death, thereby failing the second prong of the test. *Estate of True*, 82 T.C.M. (CCH) at 58. *See also Cameron W. Bommer Revocable Trust v. C.I.R.*, T.C.M. (RIA) 97380, 2422 (1997) (price term in buy-sell agreement cannot control for estate tax purposes where agreement non-binding upon decedent during life and at death). Taxpayers do not challenge this finding on appeal. Therefore, we uphold the tax court's determination that the price terms in the White Stallion Ranch buy-sell agreement should be disregarded.

215-16; Treas. Reg. § 20-2031-2(h) ("effect . . . given to the option or contract price . . . depends upon the *circumstances of the particular case*") (emphasis added). We will not reverse the tax court's decision on this question unless "we are 'left with the definite conviction that a mistake has been committed.'" *Wolf v. C.I.R.*, 4 F.3d 709, 712 (9th Cir. 1993) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

As noted above, the fourth prong of the price term control test asks whether a buy-sell agreement is entered into for bona fide business purposes and does not represent a testamentary substitute intended to pass a decedent's interests on to the natural objects of his bounty for less than full and adequate consideration. This prong of the price term control test is conjunctive in nature. The buy-sell agreement must be entered into for a legitimate business purpose, and it cannot be a testamentary device. *Dorn v. United States*, 828 F.2d 177, 182 (3d Cir. 1987); *St. Louis County Bank*, 674 F.2d at 1210; *Estate of Godley*, 80 T.C.M. (CCH) at 164; *Cameron W. Bommer Revocable Trust v. C.I.R.*, T.C.M. (RIA) 97380, 2423 (1997); *Lauder II*, T.C.M. (RIA) 92736 at 3730-31. The tax court found here, and the I.R.S. does not contest, that the True buy-sell agreements were entered into for a variety of legitimate business reasons. *Estate of True*, 82 T.C.M. (CCH) at 58-59. *See also St. Louis County Bank*, 674 F.2d at 1210 (maintenance of family ownership and control over business is legitimate business purpose); *Lauder II*,

T.C.M. (RIA) 92736 at 3731 (preserving family control and ownership over family business is bona fide purpose for buy-sell agreement); *Estate of Bischoff v. C.I.R.*, 69 T.C. 32, 39-40 (1977) (keeping business in family is legitimate business purpose). Our analysis is thus further refined to examining whether the tax court erred when it determined the True buy-sell agreements nonetheless served as testamentary substitutes.

The tax court reached its conclusion that the True company buy-sell agreements were substitutes for testamentary dispositions by first examining a variety of factors permitting an inference that the agreements served a testamentary purpose. The court then determined taxpayers failed to prove the price terms in the agreements represented adequate consideration at the time the parties entered into the agreements. Consequently, the court found the price terms were not binding for estate tax valuation purposes.

Challenging the tax court's decision, taxpayers contend the court erred by placing too great an emphasis on whether the buy-sell agreements had a testamentary purpose rather than on whether the agreements represented an exchange for full and adequate consideration. Taxpayers therefore devote little, if any, analysis to the question of testamentary purpose, instead focusing the majority of their argument on whether the buy-sell agreements were in fact supported by adequate consideration. They argue they satisfy this latter question

primarily by virtue of this court's ruling in *Brodrick v. Gore*, 224 F.2d 892 (10th Cir. 1955), and the alleged preclusive effect of the rulings in the 1971 and 1973 gift tax cases. Upon our review of the tax court's extensive opinion, as well as our own close examination of the relevant case law and the record on appeal, we conclude taxpayers' arguments cannot prevail.

A. Testamentary purpose

From the outset, we note there is not a wealth of cases outlining the full process by which a court should examine whether a buy-sell agreement satisfies the fourth prong of the price term control test. When this portion of the test is at issue, however, courts generally begin their analysis by examining a variety of factors from which they may draw an inference that the agreement served as a testamentary substitute. *See St. Louis County Bank*, 674 F.2d at 1211; *Slocum v. United States*, 256 F. Supp. 753, 754-56 (S.D.N.Y. 1966); *Cameron W. Bommer Revocable Trust*, T.C.M. (RIA) 97380 at 2424-27; *Lauder II*, T.C.M. (RIA) 92736 at 3731-33. These factors include the health or age of the decedent when entering into the buy-sell agreement, *Estate of Gloeckner*, 152 F.3d at 216; *St. Louis County Bank*, 674 F.2d at 1210; *Slocum*, 256 F. Supp. at 755; the lack of regular enforcement of the agreement, *St. Louis County Bank*, 674 F.2d at 1211; the exclusion of significant assets from the agreement, *Lauder II*, T.C.M. (RIA) 92736 at 3732; the arbitrary manner in which the price term was selected,

including the failure to obtain appraisals or seek professional advice, *id.*; *Estate of Gloeckner*, 152 F.3d at 216; *Cameron W. Bommer Revocable Trust*, T.C.M. (RIA) 97380 at 2425; the lack of negotiation between the parties in reaching the agreement terms, *id.*; *Lauder II*, T.C.M. (RIA) 92736 at 3732; whether the agreement allowed for adjustments or revaluation of its price terms, *Estate of Godley*, 80 T.C.M. (CCH) at 164; *Cameron W. Bommer Revocable Trust*, T.C.M. (RIA) 97380 at 2424, 2426; whether all the parties to the agreement were equally bound to its terms, *Brodrick*, 224 F.2d at 896; *Lauder II*, T.C.M. (RIA) 92736 at 3731; *Estate of Bischoff*, 69 T.C. at 41; *Estate of Littick v. C.I.R.*, 31 T.C. 181, 187-88 (1958); and any other testimony or evidence highlighting that the agreement supported the decedent's testamentary plan, *Estate of Godley*, 80 T.C.M. (CCH) at 161.   Moreover, "intrafamily agreements restricting the transfer of stock in a closely held corporation are subject to greater scrutiny than that given to similar agreements between unrelated parties." *Cameron W. Bommer Revocable Trust*, T.C.M. (RIA) 97380 at 2423.  *See also Lauder II*, T.C.M. (RIA) 92736 at 3731 (same); *cf. Estate of Gloeckner*, 152 F.2d at 214-15 (where beneficiary of buy-sell agreement not natural object of decedent's bounty, no testamentary device); *Bensel*, 36 B.T.A. at 252-53 (buy-sell agreement between father and son who were hostile and estranged from one another not testamentary device).

-21-

Throughout this analysis, and in light of the many factors listed above, courts often ask whether the terms of the agreement, and the manner in which those terms were established, reflect an agreement reached by parties operating at arm's length. In *Dorn*, the court noted that

> [o]ur interpretation of [20.2031-2(h)] is informed by the fact that Congress's overarching goal in this area was to limit circumvention of the general rule of fair market value at the date of death by transactions that are not at arm's length. *See* I.R.C. § 2036 (1954).
>
> Although few cases have relied on Treasury Regulation § 20.2031(h) for support, those which do discuss it support the position that the option price affects the value of the gross estate only if the option was granted at arm's length.

*Dorn*, 828 F.2d at 181. *See also Estate of Godley*, 80 T.C.M. (CCH) at 164; *Estate of Littick*, 31 T.C. at 186; *Bensel v. C.I.R.*, 36 B.T.A. 246, 252-53 (1937), *affd.* 100 F.2d 639 (3rd Cir. 1938).[9]

---

[9]Taxpayers challenge any reference to the arm's length standard in examining whether the buy-sell agreements were testamentary substitutes intended to pass Dave True's interests on to the natural objects of his bounty for less than full and adequate consideration. Taxpayers contend application of the arm's length standard is erroneous and represents an improper retroactive application of I.R.C. § 2703. They specifically raise this argument in challenging the tax court's adequacy of consideration finding. Aplt. br. at 40-44; Aplt. reply br. at 10-11. We address it here because courts refer to the arm's length standard when addressing both the question of testamentary intent and adequacy of consideration.

Section 2703 of the tax code details how restrictions in buy-sell agreements entered into after October 8, 1990, should be evaluated for tax purposes. Building upon Treasury Regulation § 20.2031-2(h), § 2703 of the tax code indicates that an option provision in a buy-sell agreement can control where

> [i]t is a bona fide business arrangement. . . . It is not a device to

(continued...)

The tax court engaged in an extensive review of all the facts and circumstances surrounding the creation and terms of the True company buy-sell agreements, and determined there was much about the agreements to support a conclusion they were testamentary substitutes. We agree.[10]

[9](...continued)
transfer such property to members of the decedent's family for less than full and adequate consideration in money or money's worth. . . . [And], [i]ts terms are comparable to similar arrangements entered into by persons in an arms' length transaction.

I.R.C. § 2703(b)(1)-(3). Commentary to § 2703 notes that the arm's length standard was a new requirement "not found in previous law." CCH-Standard Federal Tax Reports, Vol. 77, no. 46 at 68 (Oct. 18, 1990). From this, taxpayers contend the tax court erred by applying the arm's length standard to evaluate the True buy-sell agreements, as those agreements were executed long before the applicable date of § 2703. Their argument is unfounded.

While the commentary to § 2703 does indicate that the arm's length standard is a new *statutory* factor, taxpayers overlook the fact that long before the passage of § 2703, *courts* consistently considered the arm's length nature of transactions when determining the validity of buy-sell agreements created before 1990. *See, e.g., Dorn v. United States*, 828 F.2d 177, 181 (3d Cir. 1987); *Bensel v. C.I.R.*, 36 B.T.A. 246, 252-53 (1937), *affd.* 100 F.2d 639 (3rd Cir. 1938); *Estate of Lauder v. C.I.R.*, T.C.M. (RIA) 92736, 3716, 3733-34 (1992) (*Lauder II*); *Estate of Littick v. C.I.R.*, 31 T.C. 181, 186 (1958). Consequently, the tax court did not err by including within its testamentary purpose and adequacy of consideration analyses an examination of whether the parties engaged in arm's length transactions when they entered into the buy-sell agreements.

[10]We acknowledge that factors such as the decedent's health, the consistent enforcement of the agreements, and the binding of all parties equally regardless of who died first, weigh in favor of taxpayers' argument that the buy-sell agreements were not testamentary devices. Dave True was in good health in 1971 and 1973 when he entered into the buy-sell agreements with his children for True Oil and Belle Fourche Pipeline, and there is no indication Dave's health was in jeopardy as the children gained interests in the other family businesses. Similarly, the tax court found the True family was generally quite consistent in complying with the

(continued...)

As we have pointed out, where the price term in a buy-sell agreement is reached in an arbitrary manner, is not based on an appraisal of the subject interest, or is done without professional guidance or consultation, courts draw an inference that the buy-sell agreement is a testamentary substitute. *See Cameron W. Bommer Revocable Trust*, T.C.M. (RIA) 97380 at 2425 (inference of testamentary device where decedent failed to obtain professional appraisal for properties and did nothing more than consult attorney who came up with price term in one day for interests listed in buy-sell agreement); *Lauder II*, T.C.M. (RIA) 92736 at 3732 (price term reached after only informal consultation with close family financial advisor and without any formal appraisals of company); *cf. Estate of Gloeckner*, 152 F.3d at 216 (inference of testamentary intent diminished,

_____

[10](...continued)
terms of the buy-sell agreements and executed formal waivers where deviation from the agreements' terms was appropriate. *Estate of True*, 82 T.C.M. (CCH) at 61. Finally, taxpayers are correct to note that the buy-sell agreements bound all the parties equally, regardless of who died first. *See, e.g., Estate of Bischoff v. C.I.R.*, 69 T.C. 32, 41 (1977) (buy-sell agreement not testamentary device where all provisions equally applicable to all partners); *Estate of Littick*, 31 T.C. at 187 (where agreement equally binding on all family members regardless of who died first, no testamentary intent found). But we are not persuaded that these factors outweigh the many other indicators that the buy-sell agreements served as testamentary substitutes for Dave True. *See, e.g., Lauder II*, T.C.M. (RIA) 92736 at 3731-32 (court acknowledged that good health of decedent at time of entering into agreements, long period of time between execution of agreements and decedent's death, the parties' consistent adherence to the agreements, and fact that any bound party could have predeceased the others, all supported taxpayers' argument that buy-sell agreements were not testamentary substitutes; however, other factors compelled court to conclude otherwise).

in part, by fact that decedent hired independent accountant to value stock listed in buy-sell agreement). Here, Dave True sought only a limited amount of professional advice in determining to use the tax book value for the price terms in the buy-sell agreements, and he did not substantially rely on any independent appraisals in doing so.

Cloyd Harris, a long time friend and accountant of the True family and their companies, testified that Dave wanted to pick a value that "was easily determined, without having to hire appraisers and oil field engineers and so on to come up with a valuation." Rec., vol. II at 233. In discussions with Dave about the manner in which he might bring his children into the family businesses, *id.* at 228, Mr. Harris said he did not object to the use of tax book value in the buy-sell agreements. *Id.* at 232. Nevertheless, he did express some concern that when valuing the different True companies as stand-alone operations, "it would be very hard to justify book value or income tax basis value as fair market value . . . . If [one] were looking at a liquidating situation, then it would not have been a true value, but [the True companies were] an ongoing operating situation." *Id.* at 233-34. Mr. Harris believed "book value was not out of line," *id.* at 234, as a method of pricing the interests in the buy-sell agreements.

Dave True did obtain one appraisal in connection with his 1973 gift of True Oil to his children. *See Estate of True*, 82 T.C.M. (CCH) at 40; rec., vol. II at

205-06. However, the record indicates that at most the appraisal of True Oil was obtained and reviewed for litigation purposes during the 1973 gift tax case, rec., vol. II at 206, and was not relied upon by the children when entering into the agreements with their father. *Id.* at 328. Nor do taxpayers present evidence of any other appraisals obtained in connection with the children's subsequent entry into buy-sell agreements with their parents for the other True companies. Therefore, for the majority of interests at issue here, there were no outside evaluations of the value of the companies for the purpose of determining whether their fair market value was adequately represented by the price terms in the buy-sell agreements. In similar fashion to the courts in *Cameron W. Bommer Revocable Trust* and *Lauder II*, which expressed concern regarding experienced businessmen setting price terms in buy-sell agreements with only the most limited of professional advice, *Cameron W. Bommer Revocable Trust*, T.C.M. (RIA) 97380 at 2425; *Lauder II*, T.C.M. (RIA) 92736 at 3732, we agree with the tax court's determination that the manner by which Dave True selected the price terms for the buy-sell agreements contributes to a finding that the agreements were testamentary substitutes.

The court in *Lauder II* also noted that where the price term in a buy-sell agreement excluded the value of intangible assets, a further inference could be drawn that the agreement in question served a testamentary purpose. *Id.* Here,

the nature of tax book value accounting for True Oil allowed the company's proven oil and gas reserves to be omitted "because the reserves were essentially purchased with earnings from the other True companies and their value likely would be dissipated in the unsuccessful search for replacement reserves." *Estate of True*, 82 T.C.M. (CCH) at 69; *see also id.* at 63, 70-71; rec., vol. II at 234-43. Hence,

> while we appreciate that an adjusted book value formula may provide a simple and inexpensive means for evaluating shares in a company, we cannot passively accept such a formula where, as here, it appears to have been adopted in order to minimize or mask the true value of the [interests] in question.

*Lauder II*, T.C.M. (RIA) 92736 at 3732.

Another factor considered by the tax court in making its testamentary purpose determination was that the buy-sell agreements did not contain within their provisions a mechanism by which to reevaluate the price terms listed therein. *See, e.g., Cameron W. Bommer Revocable Trust*, T.C.M. (RIA) 97380 at 2424, 2426 (lack of periodic revaluation of price term one factor contributing to conclusion that buy-sell agreement was testamentary substitute). The tax court concluded, and we agree, that unrelated parties negotiating at arm's length would likely have required a periodic reevaluation of the use of tax book accounting to value the interests in the buy-sell agreements. As Mr. Harris testified, keeping True Oil's books on a tax value accounting method and employing the accelerated

depreciation methods permitted thereunder took into account the company's practice of expending the value of proven oil and gas reserves to finance the costly search for new reserves. Rec., vol. II at 234-43. If the company were to cease operating in such a manner, however, the tax book value accounting method would not be the best manner by which to value the company because the values of its reserves would not be considered. One would thus expect arm's length parties to require a regular reevaluation of True Oil's pricing formula, especially to the extent it took into account or omitted the company's proven reserves. Similarly, Eighty-Eight Oil, which was labeled as one of the True companies which generated "large sums of cash," *id.* at 242, was nonetheless reported at a negative tax book value upon Tamma's sale of her interests in that company to her brothers and parents. Rec., ex. 154-J, attachment D. Parties operating at arm's length would have certainly required the buy-sell agreements to include within their terms a method by which to reevaluate the price terms of the company in light of such a disparity.

Additionally, when the True children entered into the buy-sell agreements, there was no negotiation between the children and their father as to the terms of the agreements. The parties discussed the agreements and the reasons for the restrictions contained therein, rec., vol. II at 81, 84, 97, 303, 321-22; *id.*, vol. III at 432, but the children did not engage in any bargaining with their father about

-28-

the terms, rec., vol. II at 303. They did not seek outside counsel to represent their interests when entering or exiting the agreements, *id.* at 102, 298, 299, 361-62, nor did they have any knowledge as to who drafted the agreements, *id.* at 362; *id.*, vol. III at 471. Rather, they were presented with a business opportunity crafted by their father which they could accept or reject. *Id.* at 83-84, 132, 304; *id.*, vol. III at 432. In *Lauder II*, the tax court expressed concern about a buy-sell agreement in which the family patriarch appeared to decide unilaterally the formula price for the exchanged interests. *Lauder II*, T.C.M. (RIA) 92736 at 3732. Similarly, in *Cameron W. Bommer Revocable Trust*, the tax court viewed with suspicion a buy-sell agreement that was not reached by bona fide negotiations with respect to the price terms, and in which all the parties to the agreement were represented by the same lawyer. *Cameron W. Bommer Revocable Trust*, T.C.M. (RIA) 97380 at 2425.

Finally, what we deem most telling are the facts surrounding Tamma's departure from the True companies. Prior thereto, her father's will generally provided that the residue of his estate would pass to Jean, with the remainder passing to his four children in equal shares upon Jean's death. Rec., ex. 14-J at 1-2. After Tamma's departure from the businesses, she was wholly excluded from any interest in her father's estate. Tamma was removed from Dave's will, *id.* at ex. 11-J, and was no longer listed as a beneficiary under his living trust

agreement, *id.* at ex. 12-J, 13-J. In a document exercising a power of appointment in favor of his living trust, Dave specifically noted that Tamma's potential inheritance had been fully satisfied when she severed her financial ties with the True companies. *Id.* at 13-J at 4. At trial, Diemer testified he was aware his father excluded Tamma from his will after she sold her interests in the companies. He stated he and his father talked about the issue and that Dave "was very committed to keeping the businesses together, and he felt, on his death, that the cash [from the estate] would be necessary to keep–to stay in the business. And so, it was a conscious decision, I believe, since he made that comment, to make that decision." Rec., vol. II at 123.

Taxpayers also reported that at the time of his death, Dave's total estate was worth just over $120 million, forty-four percent of which represented the reported value attributable to Dave's interests in the True companies. Aplt. supp. br. at 2, 7.[11] If, as taxpayers contend, the buy-sell agreements were not testamentary substitutes, Tamma likely would have been excluded only from that

---

[11]In response to questioning at oral argument, counsel for taxpayers asserted that only about ten percent of Dave's estate was not connected with the True companies but admitted he was not confident this percentage was accurate. The court received supplemental briefing from the parties to clarify the total value of Dave True's estate, as well as to clarify the portion of his estate attributable to his interests in the True companies. The court also received information regarding any other irrevocable trusts, testamentary devices, or life insurance policies created or purchased by Dave or Jean during their lifetimes, and the beneficiaries listed thereunder for each.

percentage of her father's estate relating to his interests in the True companies. Instead, she garnered no benefit from her father's estate, not even from the portion not directly associated with the True companies.

Like the court deciding *Estate of Godley*, in which the decedent indicated in a deposition prior to his death that the transfer of certain interests to his son was a gift executed for the purpose of circumventing estate tax liability, *Estate of Godley*, 80 T.C.M. (CCH) at 161, we have trouble ignoring Dave's own statement in exercising his power of appointment that Tamma's inheritance had been satisfied by the sale of her interests in the True companies. Diemer's testimony supporting the same position, as well as Tamma's exclusion from the large percentage of her father's reported estate values not associated with the True companies, clearly support an inference that the buy-sell agreements served as testamentary substitutes for Dave True.

B. Adequacy of Consideration

Having determined the evidence supports the tax court's inference that the True company buy-sell agreements were testamentary substitutes, we turn to whether the tax court erred in finding the agreements were not supported by adequate consideration.

> Where shareholders are members of the same family and the
> circumstances indicate that testamentary considerations influenced
> the decision to enter into a restrictive stock agreement, an
> assumption that the price stated in the agreement is a fair one is

-31-

unwarranted. It is then incumbent upon the estate to demonstrate that the agreement establishes a fair price for the subject stock.

*Cameron W. Bommer Revocable Trust*, T.C.M. (RIA) 97380 at 2427. *See also Lauder II*, T.C.M. (RIA) 92736 at 3733. Taxpayers devote the majority of their analysis to this issue.

Courts addressing this question in the context of Treasury Regulation § 20.2031-2(h) have provided slightly varying definitions for adequacy of consideration. However, in concert with the question of whether the buy-sell agreements raise an inference of testamentary intent, courts tend to agree that the option price will be deemed adequate consideration where it represents the price a willing buyer and willing seller would have reached in the course of an arm's length negotiation. *Dorn*, 828 F.2d at 181; *Estate of Godley*, 80 T.C.M. (CCH) at 164; *Cameron W. Bommer Revocable Trust*, T.C.M. (RIA) 97380 at 2427. In *Lauder II*, the court stated:

> [adequate and full consideration] is best interpreted as requiring a price that is not lower than that which would be agreed upon by persons with adverse interests dealing at arm's length. Under this standard, the formula price generally must bear a reasonable relationship to the unrestricted fair market value of the stock in question.

*Lauder II*, T.C.M. (RIA) 92736 at 3733-34 (citation omitted). In the instant case, in addressing the question of adequacy of consideration, the tax court concluded "the formula price under the buy-sell agreement must be comparable to what

would result from arm's length dealings between adverse parties, and it must bear a reasonable relationship to the unrestricted fair market value of the interest in question." *Estate of True*, 82 T.C.M. (CCH) at 53. The court then determined taxpayers failed to satisfy this test.

In contesting the tax court's determination of the adequacy of consideration, taxpayers assert the court's emphasis on the arm's length standard is contrary to law, an argument we have already rejected. *See* note 8 *supra*. They also argue this circuit's ruling in *Brodrick* is binding precedent that the price terms in the agreements are controlling. Finally, they contend the Wyoming district court's decisions in the 1971 and 1973 gift tax cases collaterally estop the I.R.S. from disputing that the price terms in the buy-sell agreements here represented adequate consideration at the time the Trues entered into the agreements. Based on these primary arguments, taxpayers maintain the True company buy-sell agreements were all supported by adequate consideration when they were executed, and therefore the price terms in those agreements should control for estate tax purposes.

### 1. Brodrick v. Gore

In challenging the tax court's finding that the price terms in the buy-sell agreements are not binding, taxpayers assert the court erred by not following our ruling in *Brodrick*. They contend *Brodrick* controls in resolving this controversy

and that "[t]he Tax Court cannot ignore precedent that is squarely on point in the circuit to which its decision will be appealed unless the Supreme Court has changed the manner in which the law is interpreted or the law itself has changed." Aplt. br. at 21.[12] In light of taxpayers' assertions, we have carefully reviewed *Brodrick*, the statutes and regulations under which *Brodrick* was decided, and the relevant statutes and regulations passed since *Brodrick*'s issuance. We have examined those cases which reference or rely on *Brodrick* in their own analysis of whether the price terms in a buy-sell agreement control for estate tax purposes. We have also surveyed those cases which independently address the question of when and to what extent buy-sell agreement price terms implicate estate tax values. Having undertaken this analysis, we note that since we decided *Brodrick* in 1955, the manner by which courts determine when terms in a buy-sell agreement control estate tax values has evolved beyond the approach applied by our court in *Brodrick*. After due consideration and in light of this development in the law, we hold that *Brodrick* no longer represents controlling authority for our circuit on the question of when the price terms in buy-sell agreements set estate

_____

[12]Taxpayers refer to the rule outlined in *Golson v. C.I.R.*, 54 T.C. 742, 756-57 (1970), *aff'd.* 445 F.2d 985 (10th Cir. 1971), in which the tax court held it was bound "to follow a Court of Appeals decision which is squarely [on] point where appeal from our decision lies to that Court of Appeals and to that court alone." *Id.* at 757.

-34-

tax values.[13]  We therefore reject taxpayers' argument that the tax court erred in not treating *Brodrick* as wholly binding precedent for this case.

In *Brodrick*, a father and his two sons entered into a partnership governed by a written agreement.  224 F.2d at 894.  The agreement's terms included a requirement that if any of the partners decided to withdraw from the partnership, or upon the death of any partner, the withdrawing partner or his estate was obliged to offer the remaining partners his shares at a set book value, and the remaining partners were required to buy those shares.  By will, the father also bequeathed to his sons his interest in the partnership.  *Id.*  Upon his death in 1951, the sons brought an action in probate court "to compel themselves, as executors, to sell to themselves, as individuals, the decedent's interest in the partnership for . . . the alleged book value of such interest at the time of the death of the decedent."  *Id.*  The probate court appointed a special administrator to represent the estate and held an adversary hearing.  *Id.* at 895.  The probate court determined thereafter that the estate was required to sell the partnership interest to the copartners for the book value of $345,897.53.  That sum was paid to the estate by the copartners and the partnership interest of the decedent was in turn

---

[13]This opinion has been circulated to the *en banc* court whose members have unanimously agreed to our specific overruling of *Broderick* to the extent it holds, contrary to the analysis set forth *infra*, that restrictive price terms in a buy-sell agreement that determine the amount the decedent's estate will receive for the property are, as a matter of law, binding for estate tax purposes.

conveyed to the sons as copartners. *Id.*

The sons, as executors of their father's estate, then filed an estate tax return reporting the value of the partnership interest as the $345,897.53 received by the estate for that interest. *Id.* The I.R.S. challenged the reported value of the partnership interest, asserting that the interest's fair market value was higher than the amount received and that the former should control for estate tax purposes. The district court granted summary judgment for the sons and the I.R.S. appealed.

> Relying on Supreme Court authority, we held in *Brodrick* that
>
> in the absence of collusion, in the absence of other bad faith, and in the absence of its entry in a nonadversary proceeding, the order or judgment [of the probate court] must be given effect as a judicial determination that the executors were obligated to sell and convey to the surviving copartners the interest of the decedent in the partnership property for a sum equal to the book value thereof, and as a judicial determination of such book value.

*Id.* at 896 (citing *Freuler v. Helvering*, 291 U.S. 35, 45 (1934)). While we acknowledged that the book value of the partnership interests was lower than the fair market value, we stated that

> such interest was burdened and encumbered with a certain restriction contained in the partnership agreement . . . . Upon the death of the decedent, the executors under his will were . . . effectively bound and obligated to sell such interest to the surviving copartners for a sum equal to its book value at the time of the death of the decedent. The surviving copartners were effectively bound and obligated to purchase such interest from the estate and to pay therefor its book value. And inasmuch as the estate was thus bound and obligated, such interest had no value to the estate in excess of its book value. In other words, the interest of the estate in the property was by the

-36-

> contract limited in respect to value, the limitation being the book value thereof at the time of the death of the decedent. And where the interest of an estate in property is burdened and encumbered in that respect by such an effective contractual provision, the estate tax should be based upon the book value rather than a fair market value in excess of the book value.

*Id.* (citations omitted). Because the I.R.S. had failed to raise any challenge to the validity of the probate court proceeding, "and did not deny that in compliance with [the probate court] order the interest of the decedent in the partnership assets was conveyed to the surviving copartners at and for a sum equal to the book value thereof," *id.* at 897, we held the I.R.S. essentially foreclosed its opportunity to assert that the price term in the buy-sell agreement should not control for estate tax purposes. In sum, we ruled that where a property interest was burdened by specific contractual provisions, and such provisions equally bound all parties to the contract at life and at death, the value of such property for estate tax purposes would be based on the terms in the contract, rather than the property's fair market value. *Id.* at 896.

In questioning *Brodrick*'s precedential value to the case currently before us, we must remember that the instant controversy centers on determining whether the True buy-sell agreements satisfy the price term control test and, in particular, whether the agreements represent bona fide business arrangements and not testamentary substitutes intended to pass on Dave True's interests for less than full and adequate consideration. In answering this question, we are governed by

the applicable portions of the Internal Revenue Code of 1986, which is a re-

designation of the Internal Revenue Code of 1954, along with Treasury

Regulation § 20.2031-2(h). *See* Tax Reform Act of 1986, Pub. L. 99-514, 100

Stat. 2095.[14]

*Brodrick* examined portions of the Internal Revenue Code of 1939, in

particular sections 811(a), (c), and (d).[15] In reaching our decision in *Brodrick*, we

did not include in our analysis any reference to the tax regulations promulgated

under the 1939 Code. *See generally* Treas. Reg. § 81 *et seq.* (1944 cum. supp.).

Likewise, in determining that book value rather than fair market value should

---

[14]As relevant here, and highlighted throughout this opinion, this case is driven by the command of I.R.C. § 2001(a) (2000), which directs that "[a] tax is . . . imposed on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States." Section 2031(a) of the tax code further directs that "[t]he value of the gross estate of the decedent shall be determined by including . . . the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated." I.R.C. § 2031(a) (2000). The Internal Revenue Code of 1986 can be found in the most recent edition of the U.S. Code, published in 2000.

[15]In *Brodrick*, we acknowledged section 811(a) of the 1939 Code directed that "for purposes of estate tax the value of the gross estate of a decedent shall be determined by including the value of all property of the decedent to the extent of his interest therein at the time of his death." 224 F.2d at 896. In rejecting a series of affirmative defenses raised by the I.R.S. in its attempt to challenge the district court's grant of summary judgment to the *Brodrick* taxpayers, we also determined that the agreement between the father and his sons did not represent a transfer made in contemplation of death under section 811(c), or a revocable transfer under 811(d). *Id.* at 896-97. It was in this context that we said in passing, without any substantive analysis, that the agreement was supported by full and adequate consideration. *Id.* at 897.

control for estate tax purposes where the interest in the estate was burdened by an effective contractual provision, we relied on cases which focused their analysis on two core questions: was the agreement binding throughout life and death, and was it legally binding and enforceable? *See May v. McGowan*, 194 F.2d 396 (2d Cir. 1952); *Lomb v. Sugden*, 82 F.2d 166 (2d Cir. 1936); *Wilson v. Bowers*, 57 F.2d 682 (2d Cir. 1932). These cases devoted very little analysis, if any, to whether the agreement represented a testamentary substitute intended to pass on the decedent's interests for less than full and adequate consideration. The agreements in those cases were either not solely between family members, thereby limiting concerns regarding testamentary purposes, *see Lomb*, 82 F.2d at 166-67; *Wilson*, 57 F.2d at 683; or, where the agreement was between family members, the district court had "found there was no purpose to evade taxes." *May*, 194 F.2d at 397. Hence, when determining whether a buy-sell agreement should control for estate tax purposes, the focus of these earlier cases remained on the legal enforceability of the agreement and whether the agreement equally bound the parties at life and death.

It has also been noted that these early cases, including *Brodrick*, were decided principally

> by the use of a syllogism: the then Revenue Act provided that the estate tax value is the value of the decedent's property at the date of death; the value at the date of death is the amount the estate will receive for the property under the buy-sell agreement; therefore, the

estate tax value is equal to the amount payable under the buy-sell agreement.

Roger R. Fross, *Estate Tax Valuation Based on Book Value Buy-Sell Agreements*, 49 TAX LAW. 319, 327-28 (1996); *see also Fiorito v. C.I.R.*, 33 T.C. 440, 444 (1959) (where agreement sets price to be paid for property and binds all parties equally during life and at death, price term controls for estate tax purposes); *Estate of Littick*, 31 T.C. at 185-87 (agreement which binds parties to set price at life and at death will control for valuing property in estate).

The 1939 Code was revised in 1954. *See* Act of Aug. 16, 1954, Pub. L. No. 591, 68A Stat. 3, 374, 380-83. With respect to the relevant estate tax laws in this case, the statutory changes between the 1939 and the 1954 Codes were minimal. *See* H.R. Rep. No. 1337 (1954), *reprinted in* 1954 U.S.C.C.A.N. 4017, 4456-57 (noting how I.R.C. § 2031(a) (1954) (general definition for gross estate) largely corresponds to introductory material in I.R.C. § 811 (1939) (same), and how I.R.C. § 2037 (1954) (transfers taking effect at death) represent a combination and revision of law found in sections 811(c)(1)(C), (c)(2) and (c)(3) of the 1939 Code).[16] Congress also included within the Code's 1954 revisions a general delegation to the Secretary of Treasury to "prescribe all needful rules and regulations for the enforcement of [the Code], including all rules and regulations

---

[16]As noted above, the 1954 Code was re-designated under the 1986 Code. *See* Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2095.

as may be necessary by reason of any alteration of the law in relation to internal revenue." I.R.C. § 7805(a).

Under the authority of § 7805(a), and after engaging in the process of notice and comment rulemaking, *see* 23 F.R. 4529 (June 24, 1958), the Secretary of the Treasury promulgated a series of regulations in 1958, including those addressing the implementation of the estate tax. The introduction states that the regulations pertain to taxes imposed on transfers of estates of decedents dying after August 16, 1954, "and supercede the regulations contained in Part 81, Subchapter B, Chapter I, Title 26, Code of Federal Regulations (1939) (Regulations 105, Estates Tax), as prescribed and made applicable to the Internal Revenue Code of 1954 by Treasury Decision 6091 . . . ." Treas. Reg. § 20.0-1(a)(1); *see also* 25 F.R. 14021 (Dec. 31, 1960) (noting "[r]egulations under the 1939 Code, as made applicable to corresponding provisions of the 1954 Code by Treasury Decision 6091 . . . have been systematically superseded by regulations under the 1954 Code."). The new regulations constituted an effort to provide direction on how to determine the extent of taxes to be "imposed on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States." I.R.C. § 2001(a). As particularly relevant here, in order to provide guidance on how to calculate the value of a decedent's gross estate, including property in the form of unlisted stock and securities, *see* I.R.C. § 2031(a), (b), the

-41-

Secretary of the Treasury promulgated regulation § 20.2031-2(h), detailing factors to be considered when determining the value of property interests contained in an estate subject to an option or contract to purchase. *See* Treas. Reg. § 20.2031-2(h).[17] No similar regulation existed under the 1939 Code. *See generally* Treas. Reg. § 81 *et seq.* (1944 cum. supp.). Unlike *Broderick*, which involved the estate of a person who died in 1951, we are faced here with the proper method of determining the value of an estate of an individual who died in 1994, and we must include in our analysis consideration of § 20.2031-2(h), which is applicable to "the transfer of estates of decedents dying after August 16, 1954. . . ." Treas. Reg. § 20.01-1(a)(1).

With the promulgation of § 20.2031-2(h), and as evidenced by our general discussion of the regulation *supra* at 16-31, evaluation of buy-sell agreements for estate tax purposes evolved beyond merely examining the manner and extent to which the parties were bound to an agreement's terms and the syllogism noted by Fross. Today courts are required to engage in a careful examination of whether the contested agreement was a testamentary substitute intended to pass a decedent's interests to the natural objects of his or her bounty for less than full and adequate consideration. *See, e.g., Estate of Gloeckner*, 152 F.3d at 214-17;

---

[17]While Treasury Regulation § 20.2031-2(h) is titled "Valuation of stocks and bonds," it is also employed in the course of valuing partnership interests. *See* Treas. Reg. § 20.2031-3. *See also supra* 15-16.

*Dorn*, 828 F.2d at 181-82; *St. Louis County Bank*, 674 F.2d at 1210-1211; *Cameron W. Bommer Revocable Trust*, T.C.M. (RIA) 97380 at 2424-29; *Lauder II*, T.C.M. (RIA) 92736 at 3731-35; *see also Gloeckner*, 152 F.3d at 213 ("essentially four requirements have evolved for a redemption price to be considered binding for estate tax purposes."); *Lauder II*, T.C.M. (RIA) 92736 at 3729-30 (noting evolution of test for determining whether price in buy-sell agreement should control for estate tax purposes); Fross, *supra* at 330-39 (noting current focus of courts is on whether buy-sell agreement is a testamentary device). In the almost fifty years since § 20.2031-2(h) was issued, neither its construction nor its validity has ever been adversely challenged in the courts. Rather, private parties, the I.R.S., and the courts consistently cite to and rely on the regulation without question. *See, e.g., Cartwright*, 411 U.S. at 554; *Estate of Gloeckner*, 152 F.3d at 212-13; *Dorn*, 828 F.2d at 178; *St. Louis County Bank*, 674 F.2d at 1210; *Slocum*, 256 F. Supp. at 754; *Estate of Blount v. C.I.R.*, 87 T.C.M. (CCH) 1303, 1309 (2004); *Cameron W. Bommer Revocable Trust*, T.C.M. (RIA) 97380 at 2423; *Lauder II*, T.C.M. (RIA) 92736 at 3729-30; *Estate of Hall v. C.I.R.*, 92 T.C. 312, 334 (1989); *Cobb v. C.I.R.*, T.C.M. (P-H) 85208, 906, 915 (1985); *Estate of Bischoff*, 69 T.C. at 39.

With the rise of § 20.2031-2(h) and the law's evolution in this area, *Brodrick*'s influence on the question of whether price terms in a buy-sell

agreement control for estate and gift tax purposes has waned. *Brodrick* was once

regularly cited in support of the proposition that when all parties to a buy-sell

agreement were equally bound at life and death, the agreement controlled for

estate tax purposes. *See, e.g., Estate of Seltzer v. C.I.R.*, 50 T.C.M. (CCH) 1250,

1253 (1985) (construing a 1950 agreement and holding "an enforceable

agreement, which fixes the price to be paid, may limit the value of property for

estate tax purposes"); *Estate of Reynolds v. C.I.R.*, 55 T.C. 172, 189 n. 9 (1970)

(construing restrictive price terms in 1946 agreement and holding "where the

estate of a deceased partner was obligated to offer the decedent's interest to the

surviving partners and where the surviving partners were obligated to buy that

interest at a predetermined price based solely on book value, the predetermined

price was held to be the proper one for estate valuation purposes"); *Fiorito*, 33

T.C. at 444 (applying buy-sell restrictions in 1945 agreement and holding: "It now

seems well established that the value of property may be limited for estate tax

purposes by an enforceable agreement which fixes the price to be paid therefor,

and where the seller if he desires to sell during his lifetime can receive only the

price fixed by the contract and at his death his estate can receive only the price

theretofore agreed upon."). However, as the law has shifted to require additional

scrutiny to whether the agreement fulfilled a bona fide business purpose *and* was

also not some form of testamentary substitute, *see Dorn*, 828 F.2d at 182; *St.*

-44-

*Louis County Bank*, 674 F.2d at 1210; *Estate of Godley*, 80 T.C.M. (CCH) at 164; *Cameron W. Bommer Revocable Trust*, T.C.M. (RIA) 97380 at 2423; *Lauder II*, T.C.M. (RIA) 92736 at 3730-31, citations to *Brodrick* have relegated it to supporting the general approach of regulation § 20.2031-2(h), or as a specific example of how an agreement can satisfy the second prong of the price term control test by being enforceable at both life and death. *See Slocum*, 256 F. Supp at 754 (*Brodrick* supports position that agreement be binding at life and death); *Lauder II*, T.C.M. (RIA) 92736 at 3729-30 (referencing *Brodrick* as supporting general proposition that property values may be limited for tax purposes by terms in buy-sell agreement, but more specifically relying on *Brodrick* for proposition that agreement must bind all parties at life and death); *Estate of Lauder v. C.I.R.*, T.C.M. (P-H) 90530, 2595, 2600 (1990) (*Lauder I*) (noting evolution of law and citing *Brodrick* for proposition that agreement must be binding at life and death); *Estate of Wildman v. C.I.R.*, T.C.M. (P-H) 89667, 3449, 3453 (1989) (citing *Brodrick* as one of many cases embodying portions of price term control test); *Cobb*, T.C.M. (P-H) 85208 at 915 (noting evolution of law and citing *Brodrick* for proposition that agreement must be binding at life and death); *Estate of Bischoff*, 69 T.C. at 41 (citing *Brodrick* as case requiring agreement to be binding during life and at death); *Estate of Caplan v. C.I.R.*, 33 T.C.M. (CCH) 189, 192 (1974) (referencing *Brodrick* for proposition that agreement must be binding at life and

-45-

death).

Treasury Regulation § 20.2031-2(h) also supports this shift. After making explicit that "[l]ittle weight will be accorded a price contained in an option or contract under which the decedent is free to dispose of the underlying securities at any price he chooses during his lifetime," the regulation then provides that "*[e]ven if* the decedent is not free to dispose of the underlying securities at other than the option or contract price," the price will be disregarded if the agreement does not represent a bona fide business agreement or is a testamentary substitute. Treas. Reg. § 20.2031-2(h) (emphasis added). Thus, although all parties may be equally bound to an agreement furthering legitimate business purposes, it must still be shown that the agreement is not serving as a testamentary device.

Finally, it is worth observing that when Congress passed § 2703 of the tax code, *see* Pub. L. 101-508, Nov. 5, 1990, 104 Stat. 1388-498, it essentially codified the rules laid out in § 20.2031-2(h). *See* I.R.C. § 2703; *see also Estate of Gloeckner*, 152 F.3d at 214 ("the 1990 Act for all intents and purposes codifie[d the] pre-existing regulatory language" of § 20.2031-2(h)). As we discussed earlier in this opinion, *see supra* note 8, § 2703 of the tax code applies to buy-sell agreements entered into after October 8, 1990 and dictates that an option provision in a buy-sell agreement can control where

> [i]t is a bona fide business arrangement . . . . It is not a device to
> transfer such property to members of the decedent's family for less

than full and adequate consideration in money or money's worth . . . .
[And], [i]ts terms are comparable to similar arrangements entered
into by persons in an arms' length transaction.

I.R.C. § 2703(b)(1)-(3). To a great extent, this language mirrors the language

found in Treasury Regulation § 20.2031-2(h), which indicates that a price term

will not control unless

the agreement represents a bona fide business arrangement and not a
device to pass the decedent's shares to the natural objects of his
bounty for less than an adequate and full consideration in money or
money's worth.

Treas. Reg. § 20.2031-2(h). The regulation also currently directs readers to refer

to tax code § 2703 for agreements "entered into (or substantially modified after)

October 8, 1990." *Id.* For buy-sell agreements entered into or substantially

modified during the last fourteen years, there is thus no question that courts must

pay explicit attention to whether the agreement was a testamentary substitute

before allowing the agreement's terms to control for estate tax purposes. The

striking similarity between the language appearing in § 2703 of the tax code and

that found in regulation § 20.2031-2(h) contributes to our ultimate conclusion that

the True buy-sell agreements should not be examined solely in accordance with

*Brodrick*'s more limited and narrow approach.

In light of the foregoing analysis, *Brodrick* is overruled to the extent it

holds that the terms in a buy-sell agreement are wholly controlling for estate tax

purposes when the agreement's restrictive terms bind all parties equally at life

-47-

and death. For us to constrain our analysis on this question to the approach employed in *Brodrick* would run counter to the last fifty years of development in this area of the law. We are unwilling to take such a limited approach. Instead, as embodied in the analysis employed in this opinion, as well as marshaled by the tax court here and other contemporary courts addressing this question, the controlling force of a buy-sell agreement on estate tax values should be determined only after a full and careful examination of all the factors laid out in the price term control test. *Estate of True*, 82 T.C.M. (CCH) at 47-53; *Estate of Gloeckner*, 152 F.3d at 212-14; *St. Louis County Bank*, 674 F.2d at 1210; *Estate of Godley*, 80 T.C.M. (CCH) at 164; *Lauder II*, T.C.M. (RIA) 92736 at 3730-31; I.R.C. § 2703; Treas. Reg. 20.2031-2(h).

### 2. 1971 and 1973 gift tax cases

Taxpayers also contend the 1971 and 1973 gift tax cases collaterally estop the I.R.S. from arguing that the price terms in the buy-sell agreements did not represent the fair market value of the transferred interests at the time the parties entered into the agreements, and support their assertions that the price terms represent adequate consideration for estate tax purposes. Taxpayers' argument has an initial appeal because the gift tax cases did determine that the price terms in two of the buy-sell agreements represented the fair market value of the interests for gift tax purposes. Nevertheless, taxpayers draw too broad a

comparison between the gift tax cases and the current controversy.

> In our circuit, a party can rely on the doctrine of collateral estoppel where
>
> (1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party, or in privity with a party, to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

*Dodge v. Cotter Corp.*, 203 F.3d 1190, 1198 (10th Cir. 2000). *See also Murdock v. Ute Indian Tribe of Uintah & Ouray Reservation*, 975 F.2d 683, 687 (10th Cir. 1992). The Supreme Court has noted that "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Montana v. United States*, 440 U.S. 147, 153 (1979). *See also C.I.R. v. Sunnen*, 333 U.S. 591, 599-600 (1948) (use of collateral estoppel "must be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged"). We review the 1971 and 1973 gift tax cases with these precepts in mind.

As noted earlier in this opinion, Dave and Jean True transferred interests in Belle Fourche Pipeline and True Oil to their children and asserted that the book value of those interests represented the companies' fair market values. The I.R.S. disagreed and issued gift tax deficiencies against the Trues. In two different

actions, the District Court of Wyoming held the price terms listed in the buy-sell agreements for the transferred interests represented the fair market value for those companies and the I.R.S. erred in issuing gift tax deficiencies against the taxpayers. As discussed in more detail earlier in the opinion, *see supra* note 3, the district court specifically took into account the restrictive provisions in the buy-sell agreements when determining that the agreements' price terms represented the fair market value of the transferred interests. *See True*, 547 F. Supp. at 203; *True*, No. 679-131K at 3, 7.

We acknowledge that for the purposes of collateral estoppel, the second and third factors of the *Dodge* test are satisfied. The prior actions were finally adjudicated on their merits, and the party against whom the doctrine of collateral estoppel is being invoked, the I.R.S., was a party. We are not convinced, however, that the issues in the 1971 and 1973 gift tax cases are identical to those raised here, or that the I.R.S. had a full and fair opportunity to litigate the relevant issues in this case in the prior action. *See Dodge*, 203 F.3d at 1198.

First, the district court cases only examined whether the price terms for the interests in True Oil and Belle Fourche Pipeline represented the fair market value for those transactions, but did not address in any manner the value of the remaining interests at issue in this case. Thus, neither the Trues nor the I.R.S. had the opportunity to litigate whether the buy-sell agreements for Eighty-Eight

Oil, Black Hills Trucking, the True Ranches, or White Stallion Ranch represented adequate consideration at the time the agreements were executed. Second, and most importantly, the gift tax cases did not address the question the tax court had to examine here: whether the buy-sell agreements for the True companies served as testamentary substitutes.

Although the district court in the 1971 and 1973 gift tax cases determined that the price terms in the True Oil and Belle Fourche Pipeline buy-sell agreements represented the fair market value of the transferred interests for gift tax purposes, it did so by taking into account the restrictive terms in the buy-sell agreements. As we develop further in the following section, for the tax court to follow this course would run counter to the task presented to it in the current controversy. Here, any question of adequate consideration must be asked in the specific context of determining whether the True buy-sell agreements are testamentary substitutes. For the tax court to grant automatic credence to the buy-sell agreements' restrictive terms would be to assume, at the start of its inquiry, a negative answer to the core issue the court had to address: do the buy-sell restrictions serve testamentary purposes?

Moreover, because the district court in the gift tax cases was not considering testamentary intent, it did not evaluate many of the factors that indicate such an intent, as we discussed *supra* at 25-29. There was no

consideration of the fact that Dave True did not seek independent appraisals at the time he set the formula prices, *id.* at 26, nor was there any negotiation between the children and their father as to the price terms, *id.* at 29.  It is also significant that the buy-sell agreements did not contain a mechanism to periodically reevaluate the price terms over time, *id.* at 28.  These are all factors relevant to whether the formula was created as a testamentary substitute intended to pass on Dave True's interest for less than full and adequate consideration, an issue which it was unnecessary for the district court to consider in determining fair market value for gift tax purposes.

Consequently, when the district court made its determinations in the 1971 and 1973 gift tax cases, it was not deciding an issue "identical with the one presented in the action in question," *Dodge*, 203 F.3d at 1198, and neither the I.R.S. nor the taxpayers had a "full and fair opportunity to litigate the issue in the prior action." *Id.*  Because the 1971 and 1973 gift tax cases did not purport to decide whether the buy-sell agreements at issue were testamentary substitutes, we reject taxpayers' argument that those cases have preclusive effect on whether the buy-sell agreements were based on adequate consideration for estate tax purposes.

### 3. Tax court's adequacy of consideration determination

Having disposed of taxpayers' primary arguments regarding adequacy of consideration, we must now determine if the tax court clearly erred in holding

taxpayers failed to satisfy their burden of showing the agreements represented adequate consideration. After reviewing the record, we conclude the answer to this question is no.

First, taxpayers challenge the tax court's statement that only the unrestricted fair market value of the interests should be considered in evaluating whether the price terms in the buy-sell agreements represented adequate consideration when the parties entered into them. In this context, we must remember that adequacy of consideration is part of a larger determination of whether the buy-sell agreements at issue were testamentary substitutes. *Lauder II* appears to be the only case to devote any discussion to whether, when there is a strong inference that a buy-sell agreement serves a testamentary purpose, restrictions in the agreement should be given controlling weight to determine if the agreement does in fact represent the transfer of interests for adequate consideration.

As noted earlier, the tax court in *Lauder II* defined adequate consideration as "a price that is not lower than that which would be agreed upon by persons with adverse interests dealing at arm's length. Under this standard, the formula price must bear a reasonable relationship to the *unrestricted fair market value* of the stock in question." *Lauder II*, T.C.M. (RIA) 92736 at 3733-34 (emphasis added) (citation omitted). The court in *Lauder II* then assessed whether the price

in the agreements equaled adequate consideration at the time the agreements were executed. After examining a variety of experts' reports, the court included a discount for lack of liquidity as part of its valuation of the stock at issue. *Id.* at 3734-35. In doing so, the court did not specifically attribute the discount to any of the terms in the buy-sell agreements.

The approach taken by the court in *Lauder II*, and adopted by the tax court in this case, makes sense when we recall that the *Lauder II* court's analysis began with the goal of determining whether the buy-sell agreements served as testamentary substitutes. The question of adequate consideration arose only after the court drew a testamentary inference from the restrictions in the buy-sell agreements and the parties' conduct with respect to them. *Cameron W. Bommer Revocable Trust,* T.C.M. (RIA) 97380 at 2427; *Lauder II* T.C.M. (RIA) 92736 at 3733-34. Here, a number of inferences support the finding that the True company buy-sell agreements served to fulfill Dave True's testamentary plans. To allow the non-price terms in the agreements to automatically depress the value of the transferred interests for the purpose of determining whether they were transferred for adequate consideration would re-validate the controlling force of the restrictions from which a testamentary inference has already been drawn. Proceeding in such a manner would presume the viability of the agreements whose very validity is at issue for valuation purposes. Therefore, we are not

persuaded the tax court erred in following the approach laid out in *Lauder II*.

In similar fashion to the court in *Lauder II*, and in the course of examining whether the price terms in the buy-sell agreements for True Oil and Belle Fourche pipeline represented adequate consideration when the parties entered into the agreements, the tax court here applied a lack-of-marketability discount. Relying in part on the calculations provided in the SRC reports, including the report's lack-of-marketability discounts, the tax court determined that the fair market value for the Belle Fourche Pipeline interests was $80.40 per share, while the tax book value was $38.69 per share. For True Oil, the court determined the fair market value of an eight-percent partnership interest was $353,100, while the tax book value was $54,653. *Estate of True*, 82 T.C.M. (CCH) at 67. The court therefore concluded the tax book value did not equal the fair market value for the transferred interests in True Oil or Belle Fourche Pipeline. We agree and reject taxpayers' argument that the tax court's adequacy of consideration determination for True Oil and Belle Fourche Pipeline was faulty. Through its use of a lack-of-marketability discount, the tax court appropriately gave weight to taxpayers' intent to keep these companies within the family.

Aside from the SRC reports for True Oil and Belle Fourche Pipeline, taxpayers did not present to the tax court any evidence regarding the four remaining buy-sell agreements to prove they represented adequate consideration

at the time the True family members entered into them. Nor did they present any other substantive arguments for why the tax book values for the transferred interests constituted adequate consideration or represented the price at which willing buyers and willing sellers operating at arm's length would agree.

There are certainly cases in which courts have found that book value represented the fair market value or adequate consideration for transferred interests. *See, e.g., Brodrick*, 224 F.2d at 896; *Estate of Carpenter v. C.I.R.*, T.C.M. (RIA) 92653, 3332-33 (1992); *Estate of Hall*, 92 T.C. at 335-38; *Estate of Bischoff*, 69 T.C. at 41 n.9. These cases are distinguishable from the present controversy, however, as the majority of those courts rejected any potential inferences that the agreements served as testamentary substitutes. *See Estate of Carpenter*, T.C.M. (RIA) 92653, 3333 (lack of familial relation between parties to agreement); *Estate of Hall*, 92 T.C. at 334-35 (court determined I.R.S.'s argument regarding testamentary intent not supported by evidence); *Estate of Bischoff*, 69 T.C. at 41-42 (agreement not testamentary device because it was equally binding on all partners and not all partners were related). Likewise, as we discussed above in examining *Brodrick*, *see supra* section II.B.2.a, our conclusion in that case was predicated in large measure on a far more limited analysis than the tax court employed here.

Other courts have expressed doubt that book valuation can adequately

represent the fair market value of a transferred interest. *See, e.g., Ketler v. C.I.R.*, 196 F.2d 822, 827 (7th Cir. 1952); *Biaggi v. C.I.R.*, T.C.M. (RIA) 2000-048, 1490 (2000); *Estate of Ford v. C.I.R.*, T.C.M. (RIA) 93580, 3032-33 (1993). Taxpayers conceded as much at trial. Mr. Harris acknowledged that if one were valuing the True companies as stand-alone operations, "it would be very hard to justify book value or income tax basis as fair market value . . . . If you were looking at a liquidating situation, then it would not have been a true value . . . ." Rec., vol. II at 233-34. He justified use of tax book value in this case because the Trues viewed their companies as collective, ongoing concerns. *Id*.

Morever, as discussed earlier in this opinion, the deductions and rates of depreciation allowed for the oil, gas, and ranching industries pursuant to tax book accounting greatly reduced the book value of many of the True companies. For example, the book values of Belle Fourche Pipeline and Black Hills Trucking depreciated at a faster rate under tax book accounting than they would have if the companies had followed GAAP. *Id.*, vol. II at 240-41. True Oil's deductions and depletions of intangible drilling expenses also allowed for a lower tax book figure, sometimes even resulting in a negative valuation. *Id.* at 236-40; *id.*, 256. Likewise, True Oil's accounting methods ignored the "current 'discovery value' of proven reserves," *Estate of True*, 82 T.C.M. (CCH) at 71, which if recognized would have increased the stated value of the company and would likely have

affected the price a well-informed buyer would be willing to pay. Finally, tax book accounting and the associated tax incentives granted to the ranching and farming industries also allowed the taxpayers to further reduce the tax book value of their holdings. *Id.* at 71. We have difficulty believing that a businessman as successful and sophisticated as Dave True, if engaged in arm's length dealings with an unrelated party, would have sold True Oil at its low and sometimes negative tax book value even with all the restrictions included.

We do not contest that the use of tax book accounting methods may have been a legitimate way to account for the regular and ongoing businesses of the True companies, as well as providing a convenient and easy way to compute the value of the companies for the purposes of the buy-sell agreements. But taxpayers do not present any substantial evidence to prove that such a valuation method would be one to which parties dealing at arm's length would agree. In fact, the record indicates that taxpayers did not always structure their buy-sell agreements with outside parties in the same manner as they did for intra-family agreements. For instance, Dave and Jean True first owned Belle Fourche Pipeline with outside parties, and the company kept its books according to GAAP. Rec., vol. II at 78-79, 200-01. Dave and Jean eventually acquired full ownership of Belle Fourche, buying its shares from the other owners at the GAAP calculated book price or higher. *Id.*, vol. II at 200-01; *id.*, ex. 235-P, 4-5.

The White Stallion Ranch buy-sell agreement, which included members of Dave True's extended family, also departed from the standard pricing and limiting provisions existing in the other buy-sell agreements.[18]  Under the agreement, the two families were separated into two stockholder groups and the agreement allowed one group to accept a bona fide sale offer from an outside party to acquire its entire interest in the ranch if the other stockholder group failed to exercise its right of first refusal.  *Id.*, ex. 134-J at 4; rec., vol. III at 400.  Finally, Toolpushers Supply Company, another True family entity, specifically exempted shares held in the company by the True Companies Employee's Profit Sharing Trust from the restrictive terms of its buy-sell agreement.  *Id.*, ex. 117-J at 7.  This provision allowed the trust to sell its shares back to the company for more than book value.

The facts surrounding the step-transactions case, *see True*, 190 F.3d 1165, while occurring long after the parties entered into the buy-sell agreements, further support the argument that taxpayers' use of tax book value did not represent the fair market value of their properties, and would not have represented the price at which taxpayers, as willing sellers operating at arm's length, would have sold their interests to willing buyers.  In the step-transactions case, taxpayers' use of

---

[18]The outside parties to the agreement were Dave True's brother, Allen, and Allen's family.

-59-

"a series of unnecessary exchanges and transfers," *id.* at 1179, resulted in the True Ranches' acquired property being valued at a zero tax basis, notwithstanding the fact that the aggregate purchase price for the land was over $6.8 million. *True v. United States*, 1997 WL 1524779 at *4 (D. Wyo. Nov. 5, 1997). We rejected the validity of these transactions and treated the acquisition of the land as if it had been directly purchased by the True Ranches. *True*, 190 F.3d at 1179. We agree with the tax court's statement that the step transactions' effect "was to minimize or eliminate tax book value of certain assets so that Dave True could transfer interests in the affected True companies for less than adequate and full consideration." *Estate of True*, 82 T.C.M. (CCH) at 69.

Having reviewed the tax court's findings regarding testamentary inferences and adequacy of consideration, we are not convinced the court erred in determining that the True company buy-sell agreements served a testamentary purpose: to pass on Dave True's interests in the companies to his family for less than adequate consideration. The tax court did not err in determining the price terms in the buy-sell agreements were not controlling for estate tax purposes.

### III

The second and allied issue we address is whether, as the Trues contend, the price terms in the buy-sell agreements control as a matter of law for the

purposes of valuing the 1993 and 1994 lifetime transfers made by Dave and Jean

True. We review the tax court's conclusions of law on this question under the *de novo* standard, and any factual determinations for clear error. *IHC Health Plans Inc.*, 325 F.3d at 1193. So doing, we conclude the tax court correctly held the price terms in the buy-sell agreements do not control for gift tax purposes.

A federal gift tax is imposed "on the transfer of property by gift during [a] calendar year by any individual . . . ." I.R.C. § 2501(a)(1).

> Where property is transferred for less than adequate and full consideration in money or money's worth, then the amount by which the value of the property exceeded the value of the consideration shall be deemed a gift, and shall be included in computing the amount of gifts made during the calendar year.

I.R.C. § 2512(b). The gift tax does not apply, however, to "a sale, exchange, or other transfer of property made in the ordinary course of business . . . ." Treas. Reg. § 25.2512-8. In this context, we agree with the tax court's conclusion that the 1993 and 1994 lifetime transfers do not satisfy the definition of a transfer made in the ordinary course of business. *Estate of True*, 82 T.C.M. (CCH) at 73.

In elaborating on the scope of what constitutes a transaction made in the ordinary course of business, the Supreme Court has stated that

> [t]o reinforce the evident desire of Congress to hit all the protean arrangements which the wit of man can devise that are not business transactions within the meaning of ordinary speech, the Treasury Regulations make clear that no genuine business transaction comes within the purport of the gift tax by excluding a sale, exchange, or other transfer of property made in the ordinary course of business (*a*

> *transaction which is bona fide, at arm's length, and free from any donative intent*).  Thus on finding that a transfer in circumstances of a particular case is not made in the ordinary course of business, the transfer becomes subject to the gift tax to the extent that it is not made for an adequate and full consideration in money or money's worth.

*C.I.R. v. Wemyss*, 324 U.S. 303, 306-07 (1945) (emphasis added) (quotations and citations omitted).  "Simply put, any proof of donative intent will defeat the gift tax exclusion for ordinary business transactions."  *Heyen v. United States*, 731 F. Supp. 1488, 1490 (D. Kan. 1990).  *See also Cullison v. C.I.R.*, T.C.M. (RIA) 98216, 1201, 1210 (1998) (transaction not within ordinary course of business where no evidence existed indicating arm's length bargaining between grandmother and grandchildren, agreement was structured by grandmother's accountant and attorney, and agreement was created as a substitute for testamentary disposition of land); *Harwood v. C.I.R.*, 82 T.C. 239, 258 (1984) (transfer by mother to sons of interests in family partnership not in ordinary course of business where agreement was structured totally by accountant and there was no evidence of arm's length bargaining).

Our discussion in the previous section largely establishes that the transactions at issue here were neither conducted at arm's length nor without donative or testamentary intent.  We noted the lack of arm's length negotiations between the True family members when entering into the various buy-sell agreements, as well as the inferences properly drawn from those agreements: they

served, in part, to fulfill Dave and Jean True's overall testamentary plan to pass the family business on to their sons. The tax court did not clearly err in finding that these transactions could not aptly be construed as occurring within the ordinary course of business.

Nor does taxpayers' argument that the estate tax and gift tax are to be construed *in pari materia* help them. *See generally*, *Harris v. C.I.R.*, 340 U.S. 106, 107 (1950) ("The federal estate and the federal gift tax . . . are construed in pari materia, since the purpose of the gift tax is to complement the estate tax by preventing tax-free depletion of the transferor's estate during his lifetime."); *United States v. Botefuhr*, 309 F.3d 1263, 1276 n.9 (10th Cir. 2002) (same) (citing *Estate of Sanford v. C.I.R.*, 308 U.S. 39, 44 (1939)). Reflecting the *in pari materia* principle, courts valuing transferred property for gift tax purposes apply the same hypothetical willing-buyer and willing-seller standard employed in the estate tax arena. *See Estate of Reynolds*, 55 T.C. at 188-89. Identical factors are also used to determine the fair market value for a closely held business. *See Ward v. C.I.R.*, 87 T.C. 78, 101 (1986). Finally, a familiar echo arises from our previous discussion: "[t]ransactions within a family group are subject to special scrutiny, and the presumption is that a transfer between family members is a gift." *Harwood*, 82 T.C. at 258 (citing *Reynolds*, 55 T.C. at 201). In light of our conclusion that the buy-sell agreements cannot control for estate tax purposes, *see*

*supra* § II, taxpayers' reference to the *in pari materia* rule undermines their cause rather than advancing it.

Moreover, numerous courts have held that restrictive buy-sell agreements, like the ones in this case, should not necessarily control for later gift tax valuation purposes. *See, e.g., Spitzer v. C.I.R.*, 153 F.2d 967, 971 (8th Cir. 1946); *Krauss v. United States*, 140 F.2d 510, 511 (5th Cir. 1944); *C.I.R. v. McCann*, 146 F.2d 385, 386 (2d Cir. 1944); *Ward*, 87 T.C. at 105; *Harwood*, 82 T.C. at 260. *See also* Rev. Rul. 59-60, 1959-1 C.B. 237, § 8. The common theme in these cases is clear: where the terms of a buy-sell agreement detail the price at which an interest is to be sold but that interest is instead given as a gift rather than transferred as a result of an involuntary "critical event" triggering the terms of the agreement, *Spitzer*, 153 F.2d at 970-71, the agreement does not control for gift tax valuation purposes. At most, the agreement terms may serve as factors to be considered by the court in making its valuation determination. *Spitzer*, 153 F.2d at 971; *Krauss*, 140 F.2d at 511; *McCann*, 146 F.2d at 386; *Ward*, 87 T.C. at 105; *Harwood*, 82 T.C. at 260.

Here, the tax court concluded that Dave and Jean True's 1993 and 1994 transfers of company interests did not constitute the requisite "critical events" triggering the terms of the buy-sell agreements because the sales of the interests were the result of Dave and Jean True's individual and voluntary choices, rather

than being predicated on the occurrence of some involuntary event. *Estate of True*, 82 T.C.M, (CCH) at 72-73. *See also* Aple. br. at 58-60. We need not determine whether the tax court's conclusion on this specific question was accurate because we agree with the court's alternative conclusion that in any event, the agreements did not satisfy the price term control test for the purposes of estate tax valuations. Therefore, taxpayers' *in pari materia* argument for why the buy-sell agreements should control for gift tax purposes stumbles without hope of recovery. Coupled with its findings that the 1993 and 1994 lifetime transfers did not occur within the ordinary course of business, the tax court did not clearly err in concluding the price terms in the buy-sell agreements do not control for gift tax purposes.

**IV**

Having determined that the tax court did not err in finding that the price terms in the True company buy-sell agreements do not control for estate tax or gift tax valuation purposes, we must now examine whether the tax court properly valued these different interests. Taxpayers raise only one objection to the tax court's extensive valuation discussion, arguing the court erred by ignoring the buy-sell agreements' non-price terms in its valuation analysis of the True companies. Specifically, taxpayers contend the tax court wrongly failed to

consider the following: the requirement of active participation in the business; the fact that the sale of company interests was limited to other company owners; the fact that upon withdrawal of an owner, the others were required to purchase their proportional shares of the departing owner's interests; and the fact that under state partnership law the partnership could terminate when a holder of fifty percent or more of the partnership interests sold his interests within one year. Aplt. br. at 51. "We review de novo a valuation question turning on a pure question of law," *Kerr v. C.I.R.*, 292 F.3d 490, 493 (5th Cir. 2002) (citing *Adams v. United States*, 218 F.3d 383, 386 (5th Cir. 2000)), and hold the tax court did not err in the process by which it valued the True Companies.

After determining the price terms in the True company buy-sell agreements did not control the values of the True companies, the tax court also held the "restrictive provisions of the buy-sell agreements (including but not limited to the formula price) are to be disregarded" for estate and gift tax valuation purposes. *Estate of True*, 82 T.C.M. (CCH) at 74. The court reached this conclusion by relying in large measure on an earlier decision of the tax court in *Estate of Lauder v. C.I.R.*, T.C.M. (RIA) 94527, 2726 (1994) (*Lauder III*), and on Revenue Ruling 59-60, 1959-1 C.B. 237, 243-44.

In *Lauder III*, the tax court was presented with the task of valuing stocks which had been subject to restrictive buy-sell agreements. In *Lauder II*, the tax

-66-

court had previously determined that the buy-sell agreements were testamentary substitutes intended to pass on the decedent's shares to the natural objects of his bounty for less than full and adequate consideration. *Lauder II*, T.C.M. (RIA) 92736 at 3735. In assessing whether the formula prices in the agreements represented adequate consideration, the court considered the unrestricted fair market value of the shares with a discount applied for lack of liquidity. *Id.* at 3734. The court noted that while it did not deem the buy-sell "agreements invalid per se," they nonetheless had no viability for estate tax valuation purposes and were "an artificial device to minimize such taxes." *Id.* at 3735.

In *Lauder III*, the taxpayers reasserted that the buy-sell agreements should still be given some controlling force over the tax court's valuation of the stock. The court rejected this position, stating

> it would be anomalous if particular portions of the shareholder agreement are now deemed relevant to the question of the fair market value of the decedent's stock. . . . In our prior opinion, we resolved that the formula price was intended to serve a testamentary purpose, and thus would not be respected for Federal estate tax purposes. It is worth noting at this point that we have not had the opportunity to address the validity of each and every aspect of the shareholder agreement. Nonetheless, we repeat the observation made earlier in these proceedings that there is no evidence in the record that the Lauders engaged in arm's-length negotiations with respect to any aspect of the shareholder agreement. Absent proof on the point, we presume that all aspects of the agreement, particularly those tending to depress the value of the stock, are tainted with the same testamentary objectives rendering the formula price invalid.
> In light of our holding in [*Lauder II*], we hold that the specific provisions of the shareholder agreement are not relevant to the

question of the fair market value of the decedent's stock on the valuation date. Simply put, the willing buyer/willing seller analysis that we undertake in this case would be distorted if elements of such testamentary origin are injected into the determination.

*Lauder III*, T.C.M. (RIA) 94527 at 2741. But the court did not completely disregard the buy-sell agreement in its valuation analysis. Instead, it noted generally that "the shareholder agreement affirmatively demonstrates the Lauders' commitment to maintain family control over [the company.] This element is properly accounted for . . . as a component of the discount applied to reflect the lack of a public market for [the company's] stock." *Id.* at 2742. Accordingly, the tax court applied a discount for the stock's lack of liquidity or marketability. *Id.* at 2742-43.

Revenue Ruling 59-60, 1959-1 C.B. 237, instructs that a buy-sell agreement may serve as a factor in determining the fair market value of transferred interests in closely held corporations for gift tax and estate tax purposes. After discussing the factors to be considered when determining what impact an agreement might have for valuation purposes, however, the ruling notes that

> [i]t is always necessary to consider the relationship of the parties, the relative number of shares held by the decedent, and other material facts, to determine whether the agreement represents a bona fide business arrangement or is a device to pass the decedent's shares to the natural objects of his bounty for less than an adequate and full consideration in money or money's worth.

*Id.* at 243-44. Reading Revenue Ruling 59-60 in concert with the tax court's

analysis in *Lauder III*, the tax court in the instant case held that because of the testamentary inferences drawn from the True company buy-sell agreements, the other terms in the agreements should be disregarded for gift and estate tax valuation purposes. *Estate of True*, 82 T.C.M. (CCH) at 74. *See also Estate of Blount*, 87 T.C.M. (CCH) at 1319 (where agreement fails to satisfy price term control test, its other terms are to be disregarded when determining fair market value of shares subject to the agreement).

In challenging the tax court's decision to ignore the non-price terms in the buy-sell agreements, taxpayers contend the case law overwhelmingly supports a contrary position, arguing "that the restrictions in a buy-sell agreement, other than price, must be taken into account to determine the value of interests for estate and gift tax purposes." Aplt. br. at 50. *See, e.g., Spitzer*, 153 F.2d at 972 (price term does not control for gift tax purposes but tax court properly took into account other restrictive terms to value transferred interests); *McCann*, 146 F.2d at 386 (where gift tax not controlled by price term in agreement, other restrictive factors should nonetheless have been considered); *Mathews v. United States*, 226 F. Supp. 1003, 1008-09 (E.D.N.Y. 1964) (even where price terms in agreement do not control for calculating estate tax, other terms should be taken into account for valuation purposes); *Estate of Godley*, 80 T.C.M. (CCH) at 171-72 (after rejecting option price terms in agreement for estate tax purposes, court nonetheless applied

marketability discount in light of right of first refusal term in agreement); *Baltimore Nat'l Bank v. United States*, 136 F. Supp. 642, 655 (D. Md. 1955) (restrictive agreement should be considered as relevant factor in valuation for estate and gift tax); *Brookshire v. C.I.R.*, 76 T.C.M. (CCH) 659, 661-62 (1998) (formula price rejected for estate tax purposes, but restrictive agreement nonetheless a factor warranting discount in value); *Estate of Wildman*, T.C.M. (P-H) 89667 at 3453-54 (despite price terms not controlling, other restrictions in agreement required value of interest to be discounted for calculation of estate tax); *Harwood*, 82 T.C. at 263-64 (court took into account depressive effect of agreement's restrictive clauses on partnership value for gift tax purposes, even where price terms in agreement disregarded); *Reynolds*, 55 T.C. at 190-91 (where agreement price term does not control for gift tax purposes, restrictive provisions may still serve as factors in valuation process).

Given the tax court's strong language indicating it was disregarding the restrictive provisions in the buy-sell agreements to determine the value of the transferred interests, and in light of the cases cited above, one might be tempted to agree with taxpayers' assertions that the tax court erred in its valuation. The case law does generally indicate that the restrictive impact of a buy-sell agreement should be considered as a factor in valuing the interests for estate and gift tax purposes even if its specific price terms are held not to be controlling.

We agree that the existence of such a restrictive agreement, and the bona fide business reasons supporting it, should be acknowledged when determining the fair market value of an interest. A willing buyer and a willing seller with knowledge of all the relevant facts surrounding the exchange would certainly take this approach. Despite the tax court's seemingly ardent language to the contrary, however, we are not convinced the court ignored the restrictive nature of the True company buy-sell agreements in the course of valuing the interests at issue here.

In similar fashion to the tax court in *Lauder III*, the tax court here did not completely fail to consider the existence of the True companies' buy-sell agreements. Instead, the court acknowledged the agreements and recognized "that their existence demonstrates the True family's commitment to maintain family control over the True companies." *Estate of True*, 82 T.C.M. (CCH) at 89. Likewise, for those True partnerships whose agreements incorporated state partnership law, the tax court did "not ignore State law transfer restrictions." *Id.* Instead, the court noted that state partnership law imposed a variety of qualifications on an individual's ownership of interests in one of the True partnerships, which could very well depress the value of that partnership interest. *Id.* at 89-90. Some of these state law limitations included the fact that a person only becomes a partner by consent of all the other partners; a partner's transferrable interest is limited to his interests in distributions; the transferee of

an interest, unless that individual is deemed a partner, is not entitled to participate in management decisions of the partnership or inspect its books and records; a transferee of partnership interests is merely entitled to receive the distributions to which the transferor would be entitled, and upon dissolution of the partnership, the amount to which the transferor would be entitled pursuant to the partnership agreement; and the partnership is not terminated unless holders of fifty percent or more of the total partnership interests sell such interests in one year. *Id.*; rec., ex. 241-P at 8-11, ex. 242-P at 9-11.

In valuing the different True companies, the tax court applied marketability discounts to all the transferred interests by taking into account both the impact of state law partnership restrictions on the partnership interests and the restricted market which existed for the companies due to the True's intent to keep the business under family control and management. *See Estate of True*, 82 T.C.M. (CCH) at 90 (applying thirty percent marketability discount to interests in True Oil, by taking into account that interests were less marketable than actively traded interests, and that interests were subject to state law transfer restrictions); *id.*, 97-98 (applying twenty-seven percent marketability discount to Jean True's interests in Belle Fourche Pipeline in part because of family's commitment to keeping corporation privately owned); *id.*, 101-02 (applying ten percent marketability discount to interests in Eighty-Eight Oil, recognizing family's intent to keep

-72-

partnership privately owned, as well as limits imposed on interests by virtue of state partnership law); *id.*, 107 (assigning thirty percent marketability discount to Jean True's interests in Black Hills Trucking, factoring in part, family's desire to keep company under True control); *id.*, 111-12 (applying thirty percent marketability discount to True Ranches, recognizing family interest in keeping partnership private, as well as acknowledging impact state partnership laws might have on interests); *id.*, 116 (applying thirty percent marketability discount to White Stallion Ranch in light of family intent to keep ranch privately owned).

By applying marketability discounts to the True companies, the tax court explicitly acknowledged the True family's bona fide business purpose of keeping the companies under family control as embodied in the buy-sell agreements. *Id.* at 73-74. The court also recognized the depressive effect state partnership law had on the agreements, but it declined, based on its testamentary findings, to give any specific weight to the other terms present in the agreements. *Id.* at 89. Following the guidance of *Lauder III*, we are not persuaded the tax court's approach was inappropriate.

Where a court's task is to determine the value of interests on which a willing buyer and willing seller would agree, its analysis would be distorted by giving explicit weight and recognition to buy-sell restrictions whose testamentary purpose has been established. *Lauder III*, T.C.M. (RIA) 94527 at 2741.

However, a willing buyer and a willing seller would certainly take into account the limited market existing for the True companies by virtue of the family's intent to keep the entities under their control, as well as the impact state partnership law would have on the value of the interests. The tax court's application of a general marketability discount adequately took such limitations into account.[19] "[A] fair consideration of the court's opinion shows that in appraising the value of the [transferred interests] it gave to the provisions of the restrictive [agreements] the weight to which it thought them entitled in light of all the evidence in the record." *Spitzer*, 153 F.2d at 972.

## V

The final issue we must address is whether the tax court erred by imposing penalties on taxpayers for their undervaluation of the True companies. Pursuant to the tax code, the I.R.S. can assess a penalty against a taxpayer for the

---

[19]In this context, we do not think the tax court's valuation determinations are contrary to the Wyoming district court's reference in the 1971 and 1973 gift tax cases to the buy-sell agreements' restrictive provisions, or to our court's references to the agreement restrictions in *Brodrick*. *See Brodrick*, 224 F.2d at 896; *True*, 574 F. Supp. at 203; *True*, No. C79-131K at 4-5. As we have discussed above, those cases can be partially distinguished from the present controversy because the courts there did not engage, nor had any specific reason to engage, in a substantial analysis of whether the agreements lacked persuasive force by virtue of being testamentary substitutes. Moreover, the tax court here implicitly recognized the limited market for the companies through its application of marketability discounts.

-74-

underpayment of taxes. *See* I.R.C. § 6662(a). Here, the tax court determined that taxpayers' reported values for Belle Fourche Pipeline, Eighty-Eight Oil, and Black Hills Trucking were all sufficiently undervalued to warrant the imposition of penalties. *Estate of True*, 82 T.C.M. (CCH) at 129-30.[20]

Taxpayers argue that they should be relieved from paying a penalty because they showed reasonable cause and acted in good faith in valuing the companies at issue. *See* I.R.C. § 6664(c) (outlining reasonable cause exception to tax penalties). In particular, they contend their valuation was reasonable and done in good faith based on their own knowledge of the terms and effect of the buy-sell agreements, their reliance on advice received from Mr. Harris, and their review of an outside appraisal of the True companies completed by the accounting firm Arthur Andersen following Dave True's death. Likewise, they assert that their own knowledge and understanding of the 1971 and 1973 gift tax cases, coupled with the lack of any I.R.S. challenge to Tamma's sale of her interests in the True companies, substantiated their reasonable and good faith belief that the price terms in the buy-sell agreements were valid for estate and gift tax purposes. The tax court rejected these arguments, ruling that notwithstanding their sophistication

---

[20]The tax court found that the interests in Belle Fourche and Black Hills Trucking were valued at less than twenty-five percent of their actual value on the 1994 gift tax return and on the estate tax return. The interest in Eighty-Eight Oil was valued on the 1993 gift tax at more than twenty-five percent but less than fifty percent of the correct value. *Estate of True*, 82 T.C.M. (CCH) at 129.

in legal, valuation, and tax matters, taxpayers failed to properly rely on the Arthur Andersen appraisal or obtain appraisals for Dave True's 1993 lifetime transfers, and failed to seek professional legal advice as to the effect of the 1971 and 1973 gift tax cases. Therefore, the court determined the reasonable cause exception did not apply. *Estate of True*, 82 T.C.M. (CCH) at 130-31.

"Whether the elements that constitute 'reasonable cause' are present in a given situation is a question of fact, but what elements must be present to constitute 'reasonable cause' is a question of law." *United States v. Boyle*, 469 U.S. 241, 249 n.8 (1985) (emphasis deleted). We review the tax court's legal determinations *de novo* and its factual findings for clear error. *Jeppsen v. C.I.R.*, 128 F.3d 1410, 1415 (10th Cir. 1997). Particularly relevant here, we will "review the tax court's factual determinations of whether a taxpayer qualifies for the reasonable cause exception for clear error." *Sather v. C.I.R.*, 251 F.3d 1168, 1177 (8th Cir. 2001) (citing *Srivastava v. C.I.R.*, 220 F.3d 353, 367 (5th Cir. 2000); *Parrish v. C.I.R.*, 168 F.3d 1098, 1102 (8th Cir. 1999)).[21] Upon review, we

---

[21]In *Mauerman v. C.I.R.*, 22 F.3d 1001 (10th Cir. 1994), we addressed whether the tax court correctly upheld the I.R.S.'s decision to impose penalties against a taxpayer for substantial understatement of tax. There we held that our standard of review was for abuse of discretion. *Mauerman*, 22 F.3d at 1004. However, in *Mauerman* the court was examining penalties imposed against taxpayers under I.R.C. § 6661 (repealed 1989). Section 6661 detailed that "[t]he Secretary *may* waive all or part of the addition to tax provided by [the substantial understatement of liability] section on a showing by the taxpayer that there was

(continued...)

[21](...continued)

reasonable cause for the understatement (or part thereof) and that the taxpayer acted in good faith." I.R.C. § 6661(c) (repealed 1989) (emphasis added). Our court, as well as others, interpreted this section to vest with the I.R.S. the discretion as to whether to waive penalties against a taxpayer for the understatement of tax liability. *See Stanford v. C.I.R.*, 152 F.3d 450, 460 n.17 (5th Cir. 1998); *Mauerman*, 22 F.3d at 1004; *Karr v. C.I.R.*, 924 F.2d 1018, 1025-26 (11th Cir. 1991); *Mailman v. C.I.R.*, 91 T.C. 1079, 1084-85 (1988).

In 1989, Congress repealed § 6661 and replaced it with § 6664, which is at issue in this case. *See* Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, Title VII, § 7721(a), 103 Stat. 2106, 2398 (1989). The relevant language in § 6664 reads slightly differently from that of the repealed § 6661. The new section states "[n]o penalty *shall* be imposed under this part with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." I.R.C. § 6664(c)(1) (emphasis added). The legislative history accompanying § 6664(c) notes that the revised reasonable cause exception was designed, in part, to

> provide greater scope for judicial review of I.R.S. determinations of [underpayment] penalties. Under the waiver provision contained in [§ 6661(c)], the Tax Court has held that it can overturn an I.R.S. determination of the substantial understatement penalty on reasonable cause and good faith grounds only if the Tax Court finds that the I.R.S. abused its discretion in asserting the penalty. The committee believes that it is appropriate for the courts to review the determination of the accuracy-related penalties by the same general standard applicable to their review of the additional taxes that the I.R.S. determines are owed. The committee believes that providing greater scope for judicial review of I.R.S. determinations of those penalties will lead to greater fairness of the penalty structure and minimize inappropriate determinations of these penalties.

H.R. No. 101-247, at 1393 (1989), *reprinted in* 1989 U.S.C.C.A.N. 1906, 2863. Since the passage of § 6664(c), courts have examined the application of this section under the clearly erroneous standard. *See DHL Corp. & Subsids. v. C.I.R.*, 285 F.3d 1210, 1225 (9th Cir. 2002); *Sather v. C.I.R.*, 251 F.3d 1168, 1177 (8th Cir. 2001); *Srivastava v. C.I.R.*, 220 F.3d 353, 367 (5th Cir. 2000). While our court has not yet been asked to address this question, we agree with the approach

(continued...)

acknowledge the parties present comparatively persuasive arguments in support of their relative positions. On balance, however, we cannot conclude the tax court was clearly erroneous in imposing penalties on taxpayers for their undervaluation of interests in Belle Fourche Pipeline, Eighty-Eight Oil, and Black Hills Trucking.

The treasury regulations accompanying the tax code's reasonable cause exception detail that "[n]o penalty may be imposed under section 6662 with respect to any portion of an underpayment upon a showing by the taxpayer that there was reasonable cause for, and the taxpayer acted in good faith with respect to, such portion." Treas. Reg. § 1.6664-4(a). As the tax court recognized,

> [g]enerally, the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability. Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all the facts and circumstances, including the experience, knowledge, and education of the taxpayer.

*Id.* at § 1.6664-4(b)(1). While a taxpayer's reliance on an appraisal report or the advice of a tax attorney or accountant may substantiate that the taxpayer should not be subject to penalties, *see, e.g., Boyle*, 469 U.S. at 250; *DHL Corp. & Subsids. v. C.I.R.*, 285 F.3d 1210, 1225 (9th Cir. 2002); *Stanford v. C.I.R.*, 152 F.3d 450, 460-62 (5th Cir. 1998); *Mauerman v. C.I.R.*, 22 F.3d 1001, 1006 (10th

---

[21](...continued)
taken by the other circuits, and apply a clearly erroneous standard when examining whether the reasonable cause exception in § 6664(c) is satisfied.

Cir. 1994); *McMurray v. C.I.R.*, 985 F.2d 36, 42-43 (1st Cir. 1993), the law does not require taxpayers to seek outside advice to satisfy the reasonable cause and good faith exception. We are therefore not convinced that, as a matter of law, taxpayers' reasonable cause argument should be dismissed simply because they failed to obtain or only relied in limited fashion on appraisals for their tax valuations, or because they failed to seek legal advice regarding the effect of the 1971 and 1973 gift tax cases. But a taxpayer's failure to refer to appraisals or seek professional legal advice in the context of all the "pertinent facts and circumstances" a court should review to determine whether a penalty is appropriate will support a finding that the taxpayer did not act in good faith or with reasonable cause when undervaluing his tax liability. *See* Treas. Reg. § 1.6664-4(b)(1).

In favor of taxpayers, we note that one indicator of reasonable cause and good faith may "include an honest misunderstanding of fact or law that is reasonable in light of all the facts and circumstances, including the experience, knowledge, and education of the taxpayer." Treas. Reg. § 1.6664-4(b)(1). Particularly relevant here is taxpayers' reliance on the 1971 and 1973 gift tax cases. Rec., vol. II at 104, 152, 157, 158. While earlier portions of this opinion make clear that the 1971 and 1973 gift tax cases do not control for the purposes of valuing the True companies, taxpayers' belief to the contrary can certainly be

construed as "an honest misunderstanding of . . . law." Treas. Reg. § 1.6664-4(b)(1). Likewise, the fact that the I.R.S. did not pose any challenge to Tamma's withdrawal from the True companies lends further support to taxpayers' good faith belief that the price terms in the buy-sell agreements could control for tax purposes. Rec., vol. II at 104, 152, 158.

Conversely, the I.R.S. correctly points out that Dave True did not seek an outside appraisal of his interests in the 1993 lifetime transfers, but instead simply relied on the tax book values for those interests. Dave even welcomed a challenge from the I.R.S. as to the accuracy of his valuations. *Id.*, vol. II at 260-61. Dave's willingness to allow his 1993 transfers to serve as a test case to determine whether the company buy-sell agreements controlled for gift tax purposes, in and of itself, does not strike us as unreasonable or an example of bad faith. In fact, one of the central business tenets followed by taxpayers in the course of operating their companies was that the tax consequences of every business deal should be considered before finalizing any transaction. *Id.*, ex. 19-J at 1-2. Included in this consideration was whether taxpayers were willing to litigate the tax issue. *Id.* at 2. However, in light of Mr. Harris' intimation that the I.R.S. might not agree with Dave True's stated values in the 1993 transfers, *id.*, vol. II at 260, Dave's failure to obtain an appraisal undercuts the reasonableness of his actions. This is all the more so considering Dave obtained

appraisals in the context of litigating the 1971 and 1973 transfers to his children. *See* rec., ex. 235-P; *id.*, ex. 236-P.

Second, while taxpayers did obtain an appraisal of Dave's interests in the True companies following his death, their referral to and reliance on this appraisal is not consistent. In the appraisal completed by Arthur Andersen, *see* rec., ex. 267-R, many of the True companies' appraised values matched, with relative closeness, the reported book values of those interests. *Compare* ex. 267-R at ii (listing appraisal values of True companies at death of Dave True) *with* ex. 27-J (listing book values of True companies at death of Dave True). The Arthur Andersen appraisal did not give preclusive effect to the tax book value terms existing in the buy-sell agreements, but the appraisal did apply significant marketability discounts to the business interests at issue. *See* rec., ex. 267-R at ii, 7-8. Most significantly for purposes of the sanction issue, however, substantial differences existed between the Arthur Andersen appraisals for Black Hills Trucking and Belle Fourche Pipeline and the book values for those same interests. *Compare* rec., ex. 267-R at ii (listing value of Black Hills Trucking at $3,179,530 and value of Belle Fourche Pipeline at $4,108,200) *with* ex. 27-J (listing book value of Black Hills Trucking at $951,467 and Belle Fourche Pipeline at $747,723).

As acknowledged by taxpayers, the "result of [the Arthur Andersen]

appraisal was an aggregate value of the companies in the magnitude of $41,215,210 as compared to the formula price of $37,393,676, a variance of about eight percent." Aplt. br. at 61. Mr. Harris testified that he looked over the Arthur Andersen appraisal, and that it "kind of confirmed [his] suspicion that there wasn't all that much difference between fair market value and book value . . . ." Rec., vol. II at 268. However, Mr. Harris did not review the appraisal in great detail because of his admitted lack of schooling and knowledge in the area of valuations. *Id.* at 268-69. While the *aggregate* differences between the Arthur Andersen appraisal and the book values were not extraordinary, that fact does not make taxpayers' choice to ignore the vast disparity of values for Black Hills Trucking and Belle Fourche Pipeline a reasonable one.

Nor does our review of the record on appeal support taxpayers' somewhat belated argument that they substantially relied on Mr. Harris' tax advice. Mr. Harris served as an accountant for the True companies in a variety of different capacities for several decades, *id.* at 186-87, and there is no question Dave True consulted with Mr. Harris regarding the 1971 and 1973 transfers of Belle Fourche Pipeline and True Oil to his children and the 1993 transfers. *Id.* at 205-06, 258-60. Mr. Harris also entered into preliminary discussions with taxpayers about how to address the continuation of the buy-sell agreements in light of the eventual deaths of the True sons, as well as whether the businesses will be passed on to

those grandchildren who express interest in working for the True companies. *Id.* at 272-73.

But while Mr. Harris may have reviewed the estate and gift tax returns at issue in this case, he testified at trial that he was not involved in preparing them. *Id.* at 286. Moreover, it was Mr. Harris who expressed concern that the tax book values might not be accepted by the I.R.S. for the estate and lifetime transfers, and who suggested obtaining the services of Arthur Andersen for an appraisal. *Id.* at 266-68. And, as noted earlier, Mr. Harris admitted he did not thoroughly review the Arthur Andersen appraisal. *Id.* at 268-69.

Finally, when testifying at trial as to why they thought use of a tax basis value was valid, taxpayers made no direct or implied reference to Mr. Harris. Rather, their faith in the tax basis valuation was predicated on Dave True's assumption as to its validity, the alleged precedent set by the 1971 and 1973 gift tax cases, the lack of any protest by the I.R.S. regarding Tamma's withdrawal from the companies, and taxpayers' own supposition that such a valuation approach made sense given the nature of the oil and ranching industries. Therefore, we cannot say the tax court clearly erred in refusing to give much weight to taxpayers' argument that they reasonably relied on Mr. Harris' tax advice.

In conclusion, we acknowledge that whether the tax court erred in

determining that taxpayers could not rely on the reasonable cause and good faith exception laid out in I.R.C. § 6664(c) presents a close question. While we disagree with the tax court's apparent conclusion that taxpayers' failure to seek legal advice regarding the 1971 and 1973 gift tax cases precludes their ability to rely on the good faith exception, we nonetheless conclude that by taking into account "all pertinent facts and circumstances," Treas. Reg. § 1.6664-4(b)(1), the tax court did not clearly err in concluding that taxpayers could not be excused from the tax penalty.

In light of all the foregoing, we **AFFIRM** the tax court.