T.C. Memo. 2006-96


UNITED STATES TAX COURT


MICHAEL W. AND CAROLINE P. HUBER, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos.  2728-03, 3054-03,      Filed May 9, 2006.
              3553-03, 1212-04.


Arthur D. Sederbaum, Walter Luers, Stephen P. Younger, and

Catherine G. Schmidt, for petitioners.

Joseph Boylan, for respondent.

_____

[1]Cases of the following petitioners are consolidated
herewith:  Tabitha A. Huber, docket No. 3054-03; Hans A. Huber
and Laurel D. Huber, docket No. 3553-03; Michael W. and Caroline
P. Huber, docket No. 1212-04.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, <u>Judge</u>:  This case concerns the proper amounts of gift tax that petitioners, Michael W. and Caroline P. Huber, Tabitha A. Huber, and Hans A. and Laurel D. Huber, should pay under section 2501[2] on gifts of stock in the J.M. Huber Corp. (Huber) that they reported on their Forms 709, United States Gift Tax Return, during the period 1997 through 2000.  Huber stock was not publicly traded, and petitioners valued their gifts on the basis of the prices Huber used for shareholder stock transactions. These prices were determined by an independent appraiser and used in various transactions involving Huber stock.  The controversy stems from disagreement over whether these sales constitute arm's-length transactions.  We hold that the transactions in question are evidence of an arm's-length price and support the values petitioners set on their gifts.

FINDINGS OF FACT

Petitioners resided in New Jersey at the time of filing their petitions.

<u>Huber Corp.</u>

Huber was founded in 1883 by Joseph Maria Huber (J.M. Huber), who emigrated from Germany to New York City and started a printing business.  Huber is headquartered in Edison, New Jersey.

---

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended.

Huber operates a diversified business with annual sales in excess of $500 million during the years in question.  Huber is a privately held corporation, but its governance structure strives to emulate public companies by maintaining a high level of communications with its shareholders.  During the relevant taxable years, there were approximately 250 shareholders, who were generally Huber family members, as permitted by Huber's bylaws.  There were also 3,000 to 5,000 employees, most of whom were not related to the Huber family.  Huber is governed by its board of directors (the board), the majority of whom are not members of the Huber family.  Huber's CEO, president and chairman, Peter Francis, was one of petitioners' principal witnesses.  Mr. Francis has been president of Huber since 1994 and chairman since 1993.  He is the great-grandson of J.M. Huber.

Pursuant to Huber's bylaws, there is no public market for Huber shares.  Since 1993, Huber has retained Ernst & Young (E&Y) to annually appraise the Huber shares.  However, shareholders may seek waivers from the board to transfer Huber stock to nonprofit organizations, which are then allowed to hold the shares or sell them to permitted shareholders under Huber's bylaws.  The shares of Huber are held by members of the Huber family, the Huber Foundation (a nonprofit charitable organization), and various independent nonprofit organizations, including universities.

Although Huber has no formal stock buy-back program, its bylaws authorize it to redeem stock from Huber shareholders. The board is empowered to authorize redemptions and set the price at which such redemptions are offered. During the years 1996 to 2000, the board authorized 14 redemptions. In 1996, Huber bought back shares at the E&Y value. For redemptions in the years 1997 to 2000, the redemptions were at the E&Y price less 5 percent. These redemptions were from Huber family shareholders who wished to liquidate their shares and from nonprofit organizations that have received donations of shares, which include the Massachusetts Institute of Technology, Dartmouth College, Hitchcock Medical, Hamilton College, the Nature Conservancy, and the Family Planning Organization. Each of these transactions used the E&Y value to determine the redemption price.

Huber's bylaws provide the corporation the right of first refusal to purchase shares offered outside the Huber family at a price specified in the bylaws. The bylaws provide that if any shareholder attempts to sell his shares to a buyer not authorized by the bylaws, Huber has the irrevocable option to purchase the shares at the lower of the offer price, the book value, or the formula price set by the bylaws.[3] The bylaws authorize sale of Huber shares to Huber family members, including lineal

---

[3]The formula prices set by Huber's bylaws was $60.57, $77.87, $42.38, and $85.13 per share for the taxable years 1997 to 2000, respectively.

descendants of J.M. Huber, their spouses, their children, trusts whose beneficiaries are such persons, and the Huber Foundation. The bylaws also authorize shareholders to sell to independent nonprofit organizations after obtaining a waiver from the board.

E&Y Report

Since 1993, Huber has retained E&Y to prepare a valuation of Huber, and its determination is reviewed each year by the chair of Huber's audit committee.  E&Y does not perform any other auditing functions for Huber.  E&Y has used a consistent methodology for valuing Huber shares, which is comparing Huber to comparable publicly traded companies.  E&Y applies a 50-percent lack of marketability discount from the freely traded value of the shares.  Although shareholders are not generally sent copies of the E&Y reports, the reports are available for inspection by Huber shareholders.  The E&Y reports were used for the following valuation purposes by Huber and its shareholders:  (1) Valuing gifts of Huber shares made to nonprofit organizations; (2) valuing both the grant and exercise of stock options issued to Huber's CEO; (3) fixing the compensation of Huber's board members; (4) evaluating the performance of Huber as a whole; and (5) valuing shares that are bought back by Huber from its shareholders.  No one at Huber ever indicated what value or

discount was wanted before E&Y completed the reports.  Mr. Francis did not receive draft reports in advance.

Transactions Between Shareholders

From 1994 to 2000, there have been approximately 90 transactions of Huber shares between shareholders.  The shareholders are not obligated to use the E&Y value to sell their shares.  The relationships between buyers and sellers varied.  Some were as close as between parents and children or grandparents and grandchildren.  Others were as distant as between a trust and a spouse of a second cousin.  Other transactions involved nonprofit organizations which sold shares to Huber family members.  Each of these sales occurred at the E&Y value.

Petitioners timely filed their Forms 709 for the taxable years 1997 to 2000 reflecting gifts of Huber shares from petitioners to their lineal descendants.  Petitioners based the values assigned to the shares on the valuation reports prepared by E&Y.  At trial, petitioners relied principally on two sets of transactions as representative examples of the 90 sales:  The Brown estate transactions (Brown estate) and the Anne Foster trust transactions (Foster trust).

The Brown Estate Transactions

Ellen Mertens Brown, a third-generation descendant of J.M. Huber, died in 1992. At her death, Mrs. Brown owned over 300,000 Huber shares. Mrs. Brown's son, Bruce Seely, and her stepson, George Brown, were named as coexecutors of the Brown estate. The coexecutors intended to sell some of Mrs. Brown's shares of Huber in order to pay the estate tax. Since the value of the shares had not been finally determined for Federal estate tax purposes, the coexecutors obtained from the Internal Revenue Service (IRS) a series of five 1-year extensions to pay the estate tax. In mid-1997, the coexecutors settled the estate tax issues with the IRS and agreed upon the payment date of March 16, 1998, for the estate tax liability.

In the fall of 1997, Mr. Seely, who was also a Huber family member, sought to raise the necessary funds to satisfy the estate tax liability by selling the Brown estate shares held in Huber. Mr. Seely understood that he owed fiduciary duties to the Brown estate's beneficiaries (of whom he was one) to get the best price for the estate's Huber shares. Mr. Seely was familiar with E&Y's valuation and received an overview of its report annually. In addition, Mr. Seely attended Huber's annual shareholder meetings, served as a nonvoting director, and received Huber's quarterly reports, operating plan, and budget. In October 1997, Mr. Seely and Mr. Brown, as coexecutors of Mrs. Brown's estate, sold 52,796

Huber shares to a total of 25 purchasers, many of whom included distant relatives or trustees acting in their fiduciary capacities. Two of the buyers, W. Anthony Brooke and Peter S. Brock, testified at trial. Mr. Brooke is the husband of Mr. Seely's second cousin. Mr. Brooke holds an M.B.A from Stanford and currently runs a private equity firm called JMH Capital. Mr. Brooke regularly received and reviewed Huber's 5-year plan, yearly budgets, monthly financial reports, and annual reports. Mr. Brock is Mr. Seely's first cousin but sees him only occasionally. Mr. Brock is an architect with a B.A. from Princeton University and a master's in architecture from the University of California. Mr. Brock served on Huber's board for 13 years and on several other committees. All of the purchasers of Huber shares from the Brown estate paid the E&Y value.

Foster Trust Transactions

Anne H. Foster, a third-generation Huber family member, died in 1988. After the death of her surviving spouse, Raymond Foster, the beneficiaries of Ms. Foster's trust were her four children and three nonprofit organizations. In 1998, Eric Goetz became cotrustee of the Foster trust together with one of Ms. Foster's daughters, Lynn Zinn. Mr. Goetz and Ms. Zinn were also coexecutors of Ms. Foster's estate. At that time, the Foster trust held approximately 96,000 shares of Huber stock. Mr. Goetz

is not a member of the Huber family and does not own any Huber stock individually.

In 1999, the Foster trust needed $213,000 to satisfy trust expenses, including legal and accounting fees and reimbursement for the estate taxes paid by the Raymond Foster estate.  Mr. Goetz and Ms. Zinn, as cotrustees, raised this cash through several methods.  One was a sale of shares to several other family members and to a nonprofit organization at the E&Y value. The cotrustees raised approximately $30,000 from these sales.

Erika Dade, one of Ms. Foster's children and a beneficiary of the Foster trust, as well as a purchaser of Huber shares from the Foster trust, testified.  She attends Huber's annual meetings and receives and reviews Huber's quarterly reports and communications from its divisions regarding the performances of their business sectors.  She has served as a nonvoting Huber board member and sat on Huber's audit committee.  She regularly speaks with Huber's CEO, Mr. Francis (who also is her brother), about the corporation.  Further, she is knowledgeable about the E&Y valuation and comfortable with the E&Y value.  She understands the methodology that E&Y used.  To her knowledge, no one has ever complained about the E&Y valuation.  Ms. Dade is aware that other shareholders were buying and selling at the E&Y price and that the board was using the E&Y value to determine their compensation and to measure the performance of Huber.

Notices of Deficiency

Respondent issued separate notices of deficiency to petitioners.[4] Petitioners thereafter timely filed petitions with this Court objecting to the notices of deficiency.

Respondent agreed with E&Y's freely traded values of Huber shares; however, respondent took issue with the appropriate discount for lack of marketability because of a report by respondent's expert, Appraisal Economics, Inc. While E&Y has always applied a 50-percent discount since its employment with Huber in 1993, respondent's expert applied a 30-percent discount for 1997, a 25-percent discount for 1998, a 45-percent discount for 1999, and a 30-percent discount for 2000. The discrepancies in valuation of the shares are as follows:

| Year | Petitioners' Value | Respondent's Value |
|------|--------------------|--------------------|
| 1997 | $45.75 | $64.05 |
| 1998 | 51.50 | 77.25 |
| 1999 | 47.50 | 52.25 |
| 2000 | 58.00 | 81.20 |

Respondent also rejected the E&Y values because he determined the sales at these values were not arm's-length transactions. The threshold issue at trial was whether there

---

[4]Respondent issued separate notices of deficiency determining deficiencies in the gift tax of petitioners Michael A. and Caroline P. Huber for the tax years 1997, 1998, 1999, and 2000; Tabitha A. Huber for the tax years 1997 and 1998; and Hans A. and Laurel D. Huber for the tax year 1997.

were arm's-length sales of Huber shares that could be used to determine the values of the gifts made by petitioners.

OPINION

I. Burden of Proof

Respondent argues that under section 7491(a), the burden of proof does not shift to respondent but remains with petitioners. We do not reach this issue because we find that the outcome of this case is determined on the preponderance of the evidence and is unaffected by section 7491. See Estate of Bongard v. Commissioner, 124 T.C. 95, 111 (2005) (citing Blodgett v. Commissioner, 394 F.3d 1030, 1035 (8th Cir. 2005), affg. T.C. Memo. 2003-212); Estate of Stone v. Commissioner, T.C. Memo. 2003-309).

II. Arm's-Length Quality of Huber Stock Sales

Section 2501 imposes a tax on the transfer of property by gift during the taxable year. This tax is imposed whether the transfer is in trust or otherwise and whether the gift is direct or indirect. Sec. 2511. A gift of property is valued as of the date of the transfer. Sec. 2512(a). The gift is measured by the value of the property passing from the donor, rather than by the value of the property received by the donee or upon the measure of enrichment to the donee. See sec. 25.2511-2(a), Gift Tax Regs.

The fair market value of the transferred property is the "price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of relevant facts." Sec. 25.2512-1, Gift Tax Regs. Where property is transferred for less than adequate and full consideration in money or money's worth, the amount of the gift is the amount by which the value of the property transferred exceeds the value of the property received. See sec. 2512(b). In determining the value of unlisted stocks, actual arm's-length sales of the stock in the normal course of business within a reasonable time before or after the valuation date are the best criteria of market value. Ward v. Commissioner, 87 T.C. 78, 101 (1986) (citing Duncan Indus., Inc. v. Commissioner, 73 T.C. 266, 276 (1979)).

The parties dispute whether sales of Huber stock at the value set by E&Y qualified as arm's-length sales. Petitioners cite Morrissey v. Commissioner, 243 F.3d 1145 (9th Cir. 2001), revg. Estate of Kaufman v. Commissioner, T.C. Memo. 1999-119, to support the proposition that the transactions at issue qualify as arm's-length sales. In Morrissey, a family-owned corporation retained Merrill Lynch to appraise a minority interest. On the basis of the report, two shareholders sold their shares to the second largest shareholder at the price set by Merrill Lynch.

Each seller testified that the price was fair and that the sale had been under no compulsion. The Court of Appeals for the Ninth Circuit found that these two transactions satisfied the requirements of an arm's-length sale because (1) family connections were not particularly close; (2) sellers were under no compulsion to sell; (3) sellers had no reason to doubt an independent valuation of the shares by a reputable firm; and (4) there was evidence that there was no intention to make a gift to the buyer. Petitioners cite each of these factors in support of their position, while respondent contests each factor's application to this case.

We declined to extend Morrissey in McCord v. Commissioner, 120 T.C. 358 (2003), appeal docketed No. 03-60700 (5th Cir. 2003). However, McCord is distinguishable because the taxpayers based the valuation of the stock on an assignment of a portion of a partnership transferred by gift instead of on a previous sale of the stock. The taxpayers, who were husband and wife, assigned their partnership interests to their children and two nonprofit organizations. The assignees, pursuant to the assignment agreement, executed a confirmation agreement to divide the interest amongst themselves. The interest was valued by an appraiser retained by the children. The taxpayers, citing Morrissey, argued that the confirmation agreement was conclusive proof of the value of the gift interest because the agreement was

an arm's-length transaction that was the "functional equivalent" of an actual arm's-length sale.  Id. at 373 n.9.  We disagreed, stating that "it is against the economic interest of a charitable organization to look a gift horse in the mouth."  Id.  The facts in this case are not analogous to those of McCord because here actual sales took place.  The nonprofit organizations that acquired Huber shares without compulsion to sell sold them for the price that the E&Y appraisal suggested.  Unlike McCord, this is not a situation where having been designated to receive a gift, the charity would have taken whatever it could get.  Therefore, McCord is distinguishable on its facts.

The parties' analytical framework corresponds to the factors discussed in Morrissey.  The parties base their conclusions about the arm's-length nature of the sales on their view of the Huber family relationships, the presence or lack of compulsion on the part of the seller, the reasonableness of the shareholders' reliance on the E&Y value, and the intent of the parties with respect to the sales.  We shall therefore generally follow this framework and address any collateral arguments that the parties raise.

III.  Relationship of Shareholders in Huber

Respondent brings to our attention that this Court has consistently closely scrutinized purported transactions between related parties, such as family members, and often concluded that

they were not arm's-length transactions.  See <u>Kimbell v. United States</u>, 371 F.3d 257, 265 (5th Cir. 2004); <u>Estate of Bongard v. Commissioner</u>, 124 T.C. at 123.  We find respondent's characterization of the issue to be too narrow, and in addition it ignores facts that we find critical to the outcome of this case.  Respondent focuses on isolated sales that took place between closely related family members as if they were the only sales.  There were over 90 transactions that took place between 1994 and 2000 by Huber shareholders involving an amalgam of relationships:  (1) Between immediate relatives; (2) between more distant relatives; and (3) between shareholders of Huber and independent nonprofit organizations.[5]  Each of these sales took place at the E&Y value.

Respondent also suggests that there was a "taint of

_____

[5]Respondent frames his arguments in this case around the premise that there were only two sales of Huber stock--the Brown estate and the Foster trust--that provide the basis for determining whether the sale of Huber stock was at arm's length. Although the Foster trust and Brown estate sales were the most factually developed in the record and the center of the testimony, the record also shows that there were a total of 90 sales between Huber shareholders since 1994.  These sales included transactions between distant relatives and trusts, independent nonprofit organizations and Huber, and Huber family members and independent nonprofit organizations.  Respondent maintains that these transactions were not "in the record". However, the CEO of Huber and one of the former members of the board credibly testified as to their personal knowledge of these transactions.  Therefore, we are not basing our conclusions solely on the Foster trust and Brown estate sales, even though some of the transactions in those sales included parties that were not closely related.

impropriety" in the Brown estate transaction because Mr. Seely and his children were beneficiaries of trusts that purchased a portion of the shares.  However, Mr. Seely credibly testified that he had no knowledge that there were shares being purchased for these trusts since his contact was with the trustee, who was also the trustee of various other trusts and who did not identify the particular trust for which he was buying the shares.  In addition, those particular transactions make up just 1,236 shares of the over 52,000 shares of the Brown estate shares that were sold at the E&Y price.  We have already indicated that many of those sales took place between parties who had no reason to accept a price that was artificially low.  In the case of the Brown estate, Mr. Seely also sold shares to the husband of his second cousin at the E&Y price.  Mr. Seely testified that he rarely saw the distantly related buyer and was not particularly close to him.  Therefore, Mr. Seely had no reason to offer the shares to anyone at a bargain price.  Indeed, Mr. Seely had every reason to sell the stock at a fair price because as coexecutor of the estate he had a fiduciary duty to the estate's beneficiaries to do so.  Similarly, Mr. Goetz testified that he absolutely understood that he was acting as a fiduciary of the Foster trust in selling the shares.

We therefore conclude that the existence of close family relationships between parties of some of the 90 sales

transactions in the record is neutralized by the fact that many of the transactions took place between parties that were hardly related or unrelated and who had fiduciary obligations to obtain the best price. We view the variety of relationships among the shareholders in Huber as a positive indicator of the existence of arm's-length sales.

IV. Compulsion

Respondent argues that the sales of the shares from the Brown estate and the Foster trust were under "compulsion" and thus not representative of arm's-length sales. Respondent relies on Acme Mills, Inc. v. Commissioner, 6 B.T.A. 1065 (1927). However, in Acme Mills, the Court found that the taxpayers were under "very decided pressure" from their creditors to sell the property in order to settle creditor claims. Id. at 1067. There was no such pressure here. The Brown estate sold its shares to pay the estate tax; there was no immediate time constraint. The executors had been planning for a number of years to sell the shares and were waiting for their tax obligations to be resolved so that they knew how much money was needed. Once a valuation of the estate was agreed upon with the IRS, the estate had 5 months to pay the liability. The estate was able to sell the shares in just 1 month. Mr. Seely testified that he felt no pressure to sell the estate's shares and that he raised the necessary funds to pay the estate tax within a matter of weeks. We fail to see

compulsion similar to that in <u>Acme Mills</u>.  Similarly, in the case of the Foster trust, Mr. Goetz testified that he was under no pressure to sell the Huber shares.  The sales were made to pay budgeted obligations of the trust, and selling Huber shares was just one of the ways to raise the money.  Mr. Goetz had other options to raise the money.

## V.  E&Y Report

The value set by E&Y was used to set the board's compensation and measure the financial performance of Huber. Huber has retained E&Y since 1993 to prepare an independent valuation for the different situations that require a valuation of Huber shares.

Respondent attempts to demonstrate that the E&Y reports were not reliable by attacking the E&Y reports from several angles in order to persuade us that the parties were not reasonably informed about Huber's worth and thus not "motivated to realize fair market value for the stock."  First, respondent notes that the E&Y reports were 11 months old at the time of the Brown estate transactions and 8 months old at the time of the Foster trust transactions.  Respondent cites subsequent valuation reports by E&Y indicating that the price per share was increased by $5.75 and $10.50, respectively.  Because of the time lapse, respondent argues that the sellers lost out on "some increased profit".

Respondent's argument ignores the evidence. None of the parties who testified believed that there had been a significant change in Huber's finances since the last valuation, and those parties demonstrated their independent knowledge of Huber's worth. Further, we do not find the time lapse in this case to be unreasonable. See Hooker Indus. v. Commissioner, T.C. Memo. 1982-357 (crediting a single sale of stock as "best criteria of market value" even though it relied on an appraisal that was 13 months old).

Respondent argues that the parties were not reasonably informed because they did not see a copy of the E&Y report. This narrow argument fails to address that the shareholders of Huber, including the ones who testified, regularly received reports from Huber, discussed the company with its CEO, attended shareholder meetings, and participated on Huber's board of directors and its committees. Further, one of the buyers of the stock from the Brown estate, Mr. Brooke, testified that he did see the E&Y report. Whether the shareholders actually saw the report does not influence our conclusion that the parties were well informed because the modus operandi of Huber gave plenty of opportunity for shareholders to educate themselves about the company and the E&Y methodology, and the evidence shows that many of the parties to the sales at issue in fact did just that.

Contrary to another argument raised by respondent, we do not find donative intent in the transactions using the E&Y price to buy and sell Huber stock.  There is no evidence to support this assertion and much evidence that is inconsistent with it.  For example, the CEO's acceptance of an artificially low E&Y value for Huber stock would be against both his own economic interests and those of Huber and its shareholders.  The success of this centenarian company and the vast acceptance of the E&Y price by its 250 shareholders strongly suggest that the sellers of E&Y stock had every reason to believe that they were obtaining a fair price for their shares.

Respondent argues that the lack of negotiation in the transactions at issue connotes the lack of an intent to realize the best price for the value of the shares.  Respondent fails to cite any caselaw that holds that negotiation is a necessary element of an arm's-length transaction.  In fact, the weight of authority is to the contrary.  See, e.g., Kimbell v. United States, 371 F.3d at 263 ("absence of negotiations * * * over price or terms is not a compelling factor in the determination as to whether a sale is bona fide, particularly when the exchange value is set by objective factors"); Hooker Indus. v. Commissioner, supra (stock sale deemed best evidence of value where there was no price negotiation and parties accepted a third-party's valuation).

Respondent offers a final reason we should not consider the sales of Huber stock to be at arm's length. He argues that the Huber shareholders, by not offering their shares for sale to the public, failed to obtain the optimum price, which respondent assumes is higher than the E&Y value. Respondent suggests that "it is not unreasonable to assume that an unrelated individual or corporation would be willing to pay a premium, in excess of the value Huber corporation sets, to invest in the company." Respondent corroborates this argument by suggesting that the bylaws of Huber provide a right-of-first-refusal provision whereby shares offered to nonfamily members could be purchased by the corporation at a price generally higher than the value that E&Y computes. We disagree.

We reject the notion that Huber must take itself public in order to sell its shares at a fair price. Courts have long recognized the rights of shareholders in closely held companies to remain private. Estate of Hall v. Commissioner, 92 T.C. 312 (1989). In addition, the CEO, Mr. Francis, provided in his testimony bona fide business purposes for staying private. He testified that keeping Huber private would allow the company to advance key values and have a long-term view of its business.

Respondent takes his argument a step further by postulating that the bona fide business purpose of maintaining family control should be set aside if it serves as a device to "pass an interest

to the natural objects of one's bounty or to convey that interest for less than full and adequate consideration." See Estate of True v. Commissioner, T.C. Memo. 2001-167, affd. 390 F.3d 1210 (10th Cir. 2004); Bommer Revocable Trust v. Commissioner, T.C. Memo. 1997-380. This is another instance where respondent narrowly focuses on some of the transactions at issue without taking into account that the E&Y value of the stock was used in many instances. For example, in the case of a charitable donation, a higher value would be preferable because that would result in a larger deduction. We reject respondent's suggestion that almost 250 shareholders would harmoniously accept an artificially low valuation of the Huber stock so that a few people who may or may not be related to them can pay less estate tax. Further, respondent's assumption that offering a stock to the public would have garnered a higher price is purely hypothetical. The only evidence respondent offers is a mischaracterization of the Huber bylaws.

Respondent maintains that the buyback provisions provide a price that is higher than the E&Y value. According to respondent's logic, if the stock were offered to a third party and Huber exercised its right of first refusal, it would buy the shares back at a price higher than the E&Y price. This is incorrect. While the formula price set in the bylaws may be higher than the E&Y value, respondent ignores the fact that any

buyback would be at the <u>lower</u> end of the formula price, book value, or price offered by a third party.   There is no basis to suggest that there was a market available wherein a potential buyer would purchase Huber shares at a price higher than the E&Y value.

VI.  <u>Conclusion</u>

Not only have petitioners prevailed on all of the factors listed in <u>Morissey v. Commissioner</u>, 243 F.3d 1145 (9th Cir. 2001), but several other facts already discussed make their case stronger than that of the taxpayers in <u>Morissey</u>.  We conclude that the sales of Huber stock established in the record are arm's-length sales that demonstrate the best reference for the valuation of Huber shares on petitioners' gift tax returns.

To reflect the foregoing,

<u>Decisions will be entered for</u>
<u>petitioners in docket Nos. 2728-03,</u>
<u>3054-03, 3553-03, and 1212-04</u>.